EXHIBIT TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

## CIVIL ACTION NO. 4:18-CV-00576

# EXHIBIT C

1            IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3
     MICHAEL J. VEIT           )
4                              )
         Plaintiff,            )
5                              )   CIVIL ACTION
     V.                        )   NO. 4:18-CV-00576
6                              )
     LYONDELL CHEMICAL         )
7    COMPANY                   )
                               )
8        Defendant.            )

9
     ********************************************************
10            ORAL AND VIDEOTAPED DEPOSITION OF

11                      MICHAEL VEIT

12                      JULY 9, 2019

13   ********************************************************

14
          ORAL AND VIDEOTAPED DEPOSITION of MICHAEL VEIT,
15   produced as a witness at the instance of the
     Defendants, and duly sworn, was taken in the
16   above-styled and numbered cause on JULY 9, 2019, from
     9:20 a.m. to 2:45 p.m., before Mendy A. Schneider,
17   CSR, RPR, in and for the State of Texas, recorded by
     machine shorthand, at the offices of ROBERSON LAW
18   FIRM, 2700 Post Oak Boulevard, Suite 21st Floor,
     Houston, Texas, pursuant to the Texas Rules of Civil
19   Procedure and the provisions stated on the record or
     attached hereto; that the deposition shall be read and
20   signed.

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2


 3    FOR THE PLAINTIFF:

 4         MS. CHIQUIA ROBERSON
           ROBERSON LAW FIRM
 5         2700 Post Oak Boulevard, Suite 21st Floor
           Houston, Texas 77056
 6         (713) 814-1119
           croberson@robersonfirm.com
 7

 8    FOR THE DEFENDANT:

 9         MR. JOHN T. HAYS
           EVERSHEDS SUTHERLAND
10         1001 Fannin. Suite 3700
           Houston, Texas 77002
11         (713) 470-6100
           JohnHays@eversheds-sutherland.com
12

13    VIDEOGRAPHER:

14         MR. LES PATE

15

      ALSO PRESENT:
16
            MS. COLLEEN K. COCKRUM
17

18

19

20

21

22

23

24

25
```

Michael Veit
July 09, 2019                                                    3

1                        EXAMINATION INDEX

2   WITNESS:  MICHAEL VEIT

3       EXAMINATION                                      PAGE
            BY MR. HAYS                                      4
4
    SIGNATURE REQUESTED                                   224
5
    REPORTER'S CERTIFICATION                              225
6
                        EXHIBIT INDEX
7
                                                        PAGE
8       VEIT EXHIBIT NO. 1                                 96
            2015 Performance Appraisal
9
        VEIT EXHIBIT NO. 2                                139
10          07/30/2017 Letter with Enclosures

11      VEIT EXHIBIT NO. 3                                184
            12/08-12/2016 E-mail Exchange
12
        VEIT EXHIBIT NO. 4                                192
13          Plaintiff's Response to Request for
            Interrogatories
14

15

16

17

18

19

20

21

22

23

24

25

Michael Veit
July 09, 2019                                          40

1      Q.   You said you retired from -- from Honeywell.

2    You have like a retirement program there?  You collect

3    retirement from Honeywell on, like, a monthly basis

4    or --

5      A.   Not a retirement stipend.  You had a sum that

6    you had paid into 401(k), of course.

7      Q.   Mm-hm.

8      A.   And that's -- that's what I withdrew.

9      Q.   Okay.

10     A.   But if I would have stayed a little bit

11   longer, I would have earned -- I mean, the retirement

12   was minuscule because of the short time that I had

13   been, so....

14     Q.   I'd like to go back to something you said.  I

15   think you -- I mean, we started talking about Pat

16   McFall earlier.

17               You first met Pat McFall in 1986 or --

18     A.   Yes.

19     Q.   -- 1988, somewhere around there, during

20   Stone & Webster, right?

21     A.   Correct.

22     Q.   And how would you characterize your

23   relationship with Pat McFall at that time?

24     A.   Good.  I mean, I selected him to be my role

25   when I left to go to Bechtel.  So, I thought he was a

Michael Veit
July 09, 2019                                                   48

1   the first week that I was at Lyondell, where this

2   project was.   In fact it was kind of comical back

3   then, that I was in Tripp's office one day, Stan

4   Tripp's office, and -- with Pat McFall, and I said,

5   "Stan, you didn't tell me what the truth was about

6   this project before I signed on."

7                He said, "Of course not.  We would have

8   never told you the truth because you would have never

9   left Honeywell."

10                I said, "Okay."  I said, "We have a" --

11  "We have a very bad problem here."

12                In fact, the first -- on the third week

13  that I was at Lyondell was the first Foster Wheeler

14  executive review meeting with executives from Lyondell

15  at the Foster Wheeler office.

16                So, they wanted me to remove -- "they"

17  being Tim Roberts, Kevin Brown, Stan Tripp.  They

18  wanted me to remove Mr. Moulton, Quang Moulton, from

19  the project as soon as I got there.

20       Q.    And who was Quang Moulton?

21       A.    He was the project manager I was brought in

22  to replace.

23       Q.    Okay.  So, they told you during this meeting

24  that they were going to remove Quang Moulton from the

25  project director role and they were going to replace

1   him with you?

2       A.   Well, it wasn't in that meeting.  This was a

3   project review meeting.

4                 But on that day, they said -- well,

5   actually even before the meeting, they said, "We don't

6   want you keeping him around," you know, "that's why we

7   brought you in."

8                 I told him, "No, way.  I am not letting

9   him go.  He's got to stay on this project at least six

10  to eight weeks," and I said, "because I want to have a

11  real clear understanding of everything that's happened

12  and where all the interfaces were," et cetera.

13      Q.   So, it was your --

14      A.   So --

15      Q.   -- idea to him?

16      A.   -- I prevailed, and they had to keep him

17  until October the 10th.

18      Q.   Okay.  So, it was your idea to keep Quang

19  Moulton on the project?

20      A.   Oh, yes.

21                I liked Quang.  He was kind of smart-

22  alecky, but I liked him.  He's a very intelligent man

23  from Rice, a Rice graduate chemical engineer.  Very

24  sharp.  Had been with Lyondell 26 years.  He was the

25  manager of projects control.

Michael Veit
July 09, 2019                                                    68

1     Q.    You've got to wait until I'm done.

2     A.    Okay.

3     Q.    Did you sue the company because of all these,

4  you know, coordination issues that you're talking

5  about?

6     A.    No.

7     Q.    Okay.  Then, why did you sue the company?

8     A.    I sued the company for age and disability.

9     Q.    Okay.  So, what does your -- all of this --

10  that's what I was trying to get at earlier.

11              So, why do you feel like the company

12  discriminated against you because of your age?

13     A.    Well, age and disability together impacted

14  greatly to my heart attack and my physical issues that

15  I had at the site, actually, having the heart attack;

16  and the fact that I was not allowed to go back, you

17  know, into that same, equivalent-type position.

18              And they probably had health concerns,

19  of course, about me.  I had, you know, had a major

20  heart attack.  I had an aneurysm in my left ventricle

21  that 1 out of 1500 survive.  So, I'm kind of in the

22  world record book.

23              I didn't feel like they gave me an

24  opportunity to continue working.

25     Q.    Let's -- let's -- and -- and I'm sorry that

Michael Veit
July 09, 2019                                                    69

1   that -- that that happened to you, and I'm glad that

2   you've recovered.

3            So, let's start with your disability

4   claims, since that's where you're focused right now.

5            So, the disability claim.  You -- you

6   had a heart attack at work in June of 2015; is that

7   correct?

8       A.   June of 2015, I was at the jobsite actually

9   having a meeting, a good meeting, I thought, with

10  Randy Tatum and Mike Cain that I day.  I was in a lot

11  of pain.

12           3:00 o'clock in the morning, the

13  previous morning, at the La Quinta, I had woken up at

14  3:00 o'clock, thinking it was indigestion.  So, I went

15  downstairs, and there was two young girls there,

16  working the desk.  I asked them to give me the

17  directions to the emergency room because I needed to

18  drive to the emergency room, and they said, "Well, you

19  want us to call 911?"

20           I said, "No, just give me the" -- "where

21  do I go, you know?  I'll be there in a minute.  I

22  think I have indigestion bad, but I'd better go to the

23  emergency room."

24           Well they gave me a map, and I set out.

25  Couldn't find it.  I came back, and they said, "We

Michael Veit
July 09, 2019                                        71

```
 1                    They said, "Yeah, we think you had a
 2    heart attack, but we've got to do a lot more tests on
 3    you."
 4                    So, they are hooking me up and here
 5    again checking and I -- and I said, "Do you take Aetna
 6    insurance?"
 7                    "No, we don't."
 8                    I said, "Get all these off me right now.
 9    You're not going to do anything."
10                    So, they said, "No, you have to sign a
11    waiver."  I did.
12                    I went to the next emergency room.  They
13    admitted me.  Doctor comes in and says, "We don't know
14    why you're here.  You should be dead."
15                    I said, "Really?"
16                    He said, "Nobody in the history of this
17    hospital has had those kind of readings."  He said,
18    "Somebody up there doesn't want you."
19                    I said, "How do you know it's up there?"
20                    He started laughing.  He said, "Yeah,
21    you've got some problems."
22                    So, anyway, I had a right stent put in,
23    and then I had an aneurysm.  They took -- well, I
24    didn't have the aneurysm right away.  The aneurysm was
25    really caused by being stupid on my part to wait
```

Michael Veit
July 09, 2019                                                     72

1   39 hours before a doctor actually saw me.

2            But when I got home after the stent was

3   put in, which was a difficult stent because the artery

4   was blocked.  They were having some -- some issues

5   getting it in.  They finally got it in.  And I'm

6   listening to all this while they're putting a stent

7   in.

8            But then I went to go back to work.  I

9   called Pat McFall and I said, "Hey, I can return to

10  work in the middle of July."

11           And he said, "Oh.  Okay.  Good."

12           So, I went to get checked out, and they

13  did an echocardiogram -- wasn't going do it at

14  first -- and he tells -- he tells me.  He says, "Hey,

15  you're going back to the emergency room like right now

16  because you have a huge aneurysm."

17           He showed me a normal heart.  He said

18  this is your heart.  We don't understand how any blood

19  is getting to your heart.  Must be all those aspirin

20  you took.  All those little veins carrying blood to

21  your heart, but we've got to reconstruct your

22  ventricle."

23           I said, "Okay.  I'm gong to go home and

24  take a shower, and then I'll go to the emergency

25  room."

Michael Veit
July 09, 2019                                        74

1    he told you that Lyondell is going to have to be

2    careful letting you come back to the site?

3        A.   Yes.

4        Q.   Okay.  And because of the -- the fact that

5    you had had a heart attack?

6        A.   Yes.

7        Q.   Let's -- so, I -- I want to go back.  I'm

8    sorry.  I just want to make sure we cover everything.

9    But I want to go back to talk about, your heart attack

10   occurred in June of '15, correct?

11       A.   Yes.  June --

12       Q.   And --

13       A.   -- 25th.

14       Q.   And you started working at Lyondell in August

15   of 2014, correct?

16       A.   Yes.  August --

17       Q.   Okay.  So --

18       A.   -- 26th.

19       Q.   -- at the time of your heart attack, you had

20   only been working for the company for about --

21   almost -- just shy of ten movants?

22       A.   Yes.

23       Q.   Okay.  Like one day shy of ten months, right?

24       A.   Yes.

25       Q.   So, technically, you weren't eligible to take

Michael Veit
July 09, 2019                                                    75

1   FMLA leave at that time, were you?

2       A.   That was in the 2010 procedure.  They chose

3   to give me the FMLA leave.

4       Q.   Right.  So, they still --

5       A.   Yes.

6       Q.   -- afforded you the opportunity --

7       A.   Yes.

8       Q.   -- to get paid out from FMLA, right?

9       A.   Yes, they did.

10      Q.   Okay.  All right.  And so, after your heart

11  attack, you -- in June, you took paid FMLA leave while

12  you were being evaluated by the doctors, correct?

13      A.   Yes, from June until returned after my

14  aneurysm surgery, which was September 21st.

15      Q.   Okay.  And so, I guess, when you came back to

16  work in --

17               Well, you said September 21st?

18      A.   Of 2015.

19      Q.   -- did you have any restrictions when you

20  came back to work in 2015?

21      A.   Yes.  The typical heart attack victim

22  restrictions.  You can't carry any weight, can't do

23  any physical lifting and things.

24               I mean, I -- I didn't have that kind of

25  job anyway, so it was just more what you don't want to

Michael Veit
July 09, 2019                                                          76

1    do at home.

2        Q.   Right.  So, these weren't -- these weren't

3    things that required you to have -- that required the

4    company to, like, accommodate you to continue doing

5    your job, correct?

6        A.   Not accommodate me for those kinds of

7    restrictions.  I mean, I didn't lift anything other

8    than books and briefcase; so, no.

9        Q.   Okay.  So, your -- your claim isn't that you

10   asked the company for an accommodation to come back to

11   work and they -- they denied you that accommodation,

12   is it?

13       A.   They didn't deny me accommodation.  You mean,

14   an office?  Or what?

15       Q.   No.  Like an accommodation for your

16   condition, for your -- for your alleged disability,

17   after your heart attack.

18       A.   Well, the disability restrictions were

19   physical; so, no, they didn't.

20            I didn't have to ask them for any

21   accommodations to maintain the restrictions.

22       Q.   And you in fact came back to work and

23   continued working in -- on September 21st, 2015,

24   correct?

25       A.   Yes.

Michael Veit
July 09, 2019                                          77

1        Q.    And you worked from September 1st [verbatim],

2    2015, as a project --

3        A.    21st.

4        Q.    21st of 2015 --

5        A.    To --

6        Q.    -- as a project director, same position,

7    until you were terminated in January of 2016, correct?

8        A.    My title, my administrative title, was

9    project director.  I wasn't a project director when I

10   came back.  I wasn't really -- I wasn't a project

11   director on the capital project.  The title was,

12   project manager.

13            The job that I was assigned to when I

14   came back was to interface with a licensor, UOP, for a

15   butamer unit that was part of the big new PO 13

16   project that's ongoing, a $2.4 billion project that's

17   in construction, I guess, now.

18       Q.    So, another -- another big Lyondell project,

19   correct?

20       A.    Yes.  My only -- my only assignment was for

21   interface with the licensor and to contribute, you

22   know, based on my knowledge, to selection of the -- of

23   the engineering contractor; which, I did that, and we

24   were evaluating Bechtel and KBR and Fluor.

25       Q.    But -- and so, you came back, and you were --

Michael Veit
July 09, 2019                                        78

1   you were still in the same position.  You were still a

2   Level M1, correct?

3        A.   I was still a Level M1 from pay and title, I

4   guess you could say; administrative title.

5        Q.   Okay.  So, you were paid the same after you

6   came back --

7        A.   Paid the same --

8        Q.   -- from leave?

9        A.   -- yes.

10       Q.   And you had the same title when you came back

11  from leave, yes?

12       A.   I was still an M1 associate director --

13       Q.   Of global projects?

14       A.   -- from an administrative -- yeah, in the

15  global projects group.

16       Q.   Okay.

17       A.   Yes.

18       Q.   And so, your testimony is that they -- they

19  just put you in a different position when you came

20  back?

21       A.   Yeah.

22       Q.   On a different project, correct?

23       A.   Yes.  I mean, they shunted me to really

24  nothing to do.  I really had nothing to do.

25                 The interface with the licensor was

Michael Veit
July 09, 2019                                                    84

```
 1      Q.   Okay?

 2      A.   N-A-B-O-R-S.

 3      Q.   Okay.  And -- but McFall didn't get let go

 4   from Lyondell.

 5              He's still with Lyondell, right?  As far

 6   as --

 7      A.   Yes.

 8      Q.   -- you know?

 9      A.   As far as I know --

10      Q.   Okay.

11      A.   -- yes.

12      Q.   All right.  So, he was temporarily filling in

13   for you while you were gone, and then they hired Jim

14   Nabors or they brought Jim Nabors in to take over on a

15   permanent basis while you were out; is that correct?

16      A.   That's correct.

17      Q.   Okay.  And so -- and then you came back from

18   medical leave in September, and it sounds like the

19   basis of your disability claim is that the company

20   didn't put you back in the same position you were in

21   before; is that correct?

22      A.   And equivalent position, right.

23      Q.   Okay.  So -- and that's the only basis for

24   your disability claim?

25      A.   Well, from that standpoint, that I wasn't
```

1   treated as a well employee; that they -- you know,

2   they were paying me a good salary to execute projects.

3   That's what I had done.  And they were pigeonholing me

4   in a small interface with a licensor; and that

5   project, I don't even know if it actually is part of

6   the PO 13 because there was some question as whether

7   that project might be dropped.

8                    So, that was not what I was told when I

9   was at home, talking with McFall in August of 2015.

10  He had this listing of different projects that he was

11  going to put me on, one in Matagorda, one in La Porte;

12  different projects.  But then, when I came back, I

13  think they made a -- an attempt to put me on that

14  project and told me that, you know, it's lower stress

15  for me, and "Take it easy."

16     Q.   Yeah.  So, were any of these -- were any of

17  these big projects that you're talking about that

18  McFall had talked to you about in August, were any of

19  those underway when you came back in September of

20  2015?

21     A.   No.  They were being budgeted.  But they did

22  become underway later.

23     Q.   And do you remember -- I mean, but when you

24  came back, there -- there was no project for you to go

25  on, these big projects, is what I'm getting at.

Michael Veit
July 09, 2019                                          86

1      A.   No.  There was projects.

2      Q.   But they -- they hadn't started yet, right?

3      A.   They hadn't started, right.

4      Q.   So, you were put on one of the projects that

5    had already started; the butamer unit, right?

6      A.   The butamer unit was -- well, that was not

7    started.  The project was started from a process

8    design standpoint with Samsung.  So, I was in

9    Samsung's office in Houston, and we were doing that

10   job and then sending out the basis of design that

11   Samsung completed for engineering companies to bid on.

12   Bechtel, KBR, Fluor, they were sent a, you know,

13   inquiry.

14     Q.   Mm-hm.

15     A.   Request for quotation.

16     Q.   And so, you were -- and then -- and that was

17   going to be a five-year job, right?  So, it was not

18   like they were pigeonholing you somewhere.  You were

19   going to be on a big project that was going last the

20   next five years, right?

21     A.   Well, that's what I thought, yes.

22     Q.   Right.

23     A.   I mean, I thought I was going to continue

24   working.  In fact, I told Pat McFall back in August

25   that -- you know, latter part of August, before I came

Michael Veit
July 09, 2019                                                87

1    back, when he was telling me I was going to go to the

2    butamer unit at the end of August.

3                    Different from what he was telling me at

4    the beginning of August, after I came out of my

5    aneurysm surgery.  He was saying that "This is a

6    five-year project, you know, we don't know what it's

7    going to" -- "when it's going to go, what the time

8    frame is for the approval of the expenditure, AFE";

9    but they were targeting December, I think, of 2016

10   that I was going to be on that project, yes.

11       Q.   And you also testified that they said one of

12   the reasons why -- Pat McFall said one of the reasons

13   why they were putting you on that project and not back

14   on the capital project is that they expected that the

15   capital project was only going to last another four

16   weeks, right?  It lasted longer, you said.  But --

17       A.   Yeah.

18       Q.   -- they expected it was only going to last

19   four more weeks anyway?

20       A.   Yes.  That they would let Charlie Etter

21   finish the final four weeks, uh-huh.

22       Q.   And Jim Nabors, too, right?

23       A.   No.  I think Jim Nabors was when -- Jim

24   Nabors was brought in in September.  Probably decision

25   was made because of the lack of capability for Etter

Michael Veit
July 09, 2019                                              91

1              MR. HAYS:  -- take another break real

2    quick.

3              THE VIDEOGRAPHER:  Off the record at

4    11:15.

5              (Break from 11:15 p.m. to 11:23 p.m.)

6              THE VIDEOGRAPHER:  On the record at

7    11:23.

8        Q.  (BY MR. HAYS)  Okay, Mr. Veit.  We're back on

9    the record after a short break.

10             And is there anything you've testified

11   to previously that you need to change or clarify in

12   any way?

13       A.   I probably need to clarify on the disability

14   claim.

15             I think that it was directly related to

16   my termination by Stan Tripp on January 26, 2016.  I

17   think it had a part of -- major part in that

18   termination.

19       Q.   One question --

20       A.   You know, I had some very, very extensive,

21   high-cost surgeries and treatments.  I know that these

22   things are discussed, you know, from a corporate

23   standpoint; and I was -- I was a liability, I think.

24       Q.   So, first of all, what caused you to come to

25   that conclusion during the break and change your

Michael Veit
July 09, 2019                                              92

1    testimony?

2        A.   Well, I am thinking that after -- when I was

3    at Lummus, I was caught in a force reduction back

4    then; back in 2003, I guess it was.  My wife had had a

5    very major surgery.  I mean, we're talking hundreds of

6    thousands of dollars for -- to correct her back from

7    scoliosis.  And right after she got out of the

8    hospital was kind of -- I mean, I saw the bills that

9    the company had paid for.

10                So, I kind of think that that's part of

11   every individual that has high medical bills with a

12   company.  It's not, of course, something you can say

13   or anything; but I think, you know, I was a liability,

14   I think, that's why they didn't want to send me back

15   to the site.

16       Q.   I'm sorry --

17       A.   I might have a heart attack again.

18       Q.   I'm sorry to hear that your wife had those

19   issues, but I'm trying to figure out how that made you

20   change your testimony that you testified to

21   previously.

22       A.   Well, I think I left that out, that that's

23   part of my claim, you know, the disability, is my

24   termination; that that was influencing my termination.

25       Q.   Okay.  So, it's your testimony that you think

Michael Veit
July 09, 2019                                                          93

1  that somebody at the company took into account that --

2  your medical expenses and decided to terminate you.

3              Is that your testimony?

4      A.   No, I don't think that.  I am saying that it

5  might have been a contributing factor in my case.

6              But I think the fact that they wouldn't

7  assign me back to the site was, my health condition;

8  why they emphasized putting me on the low-stress job

9  on the butamer unit.

10     Q.   But you have no way of knowing that one way

11  or another, do you?

12     A.   I have no way of knowing that, of course.

13     Q.   Nobody at the company saying, "Hey, we're

14  not" --

15     A.   Of course.

16     Q.   -- "putting you back on this project," right?

17     A.   Huh?

18     Q.   "We're not" -- nobody at the company said,

19  "We're not putting you back on this project because of

20  your disability," right?

21     A.   Nobody from the company said that to me.

22     Q.   Right.  And nobody --

23     A.   Only the conversation I had, supposing that

24  that was a big factor from a liability standpoint.

25  They couldn't afford me to be out at the jobsite.  I

Michael Veit
July 09, 2019                                          95

1    attack, on the site there.  You were on the site,

2    having a heart attack.  They didn't send you to the

3    infirmary there at the site.  So" -- you know, "you

4    drove home and ruined your heart muscle and had an

5    aneurysm.  So, they're not going to let you come

6    back."

7        Q.   But you no -- have no personal knowledge

8    whether or not that's the reason other than

9    philosophical conversation you had with Mr. Czaplicski

10   [verbatim]?

11       A.   Correct.  I had no direct statement from

12   Lyondell.

13       Q.   Okay.  And in your performance appraisal in

14   2015, the meeting with Mr. McFall, y'all talk about

15   things other than, you know, your -- your new

16   assignment, right?  Did you talk about your

17   performance at all?

18       A.   No.  Actually, the only -- no, we didn't talk

19   about any performance at the -- on the project, on my

20   CC project.

21       Q.   So, on the -- you and McFall didn't talk

22   about the capital project at all during your -- your

23   annual performance review in 2015?

24       A.   The only thing we talked about was, I was

25   explaining to him why the project went the way it did.

Michael Veit
July 09, 2019                                    112

1    mean, you're talking about Jones relating Tatum and

2    Cain?  Tatum, yeah.  Tatum.  He -- of course he would

3    tell me about Tatum complaining about me.  Tatum

4    complained about me from day one.

5          Q.   So, let's get back to -- let's get back to

6    your claims in the lawsuit.

7                    One of your claims in this lawsuit is

8    also that the company discriminated against you based

9    on your age; is that correct?

10         A.   Yes.

11         Q.   What's the basis of that claim?

12         A.   Same thing with the disability.  The fact

13   that I was getting older and not capable of executing

14   the project.

15                   And, you know, I was an older guy in --

16   in -- a high salary, older guy in the -- in the lineup

17   there.

18         Q.   Okay.  So, is your allegation then that you

19   were -- you were replaced by somebody younger?  Did

20   somebody replace you that was younger than you?

21         A.   Yes.

22         Q.   And who was that?

23         A.   Well, let's say Jim Nabors definitely was

24   younger than me.

25                   When I left the butamer project, they

Michael Veit
July 09, 2019                                    116

1      A.    Yeah.  About that age, yeah.

2      Q.    And -- and is there any other basis for your

3   age discrimination claim besides what you've already

4   testified to here today?

5      A.    Well, you know, Lyondell has had quite a

6   reputation of churning out project directors, project

7   managers.  In fact, the headhunter -- before I went to

8   Lyondell, I actually was going to be a Foster Wheeler

9   manager.  I had an opportunity with Foster Wheeler.

10  But when I went for the interview with the different

11  people at Lyondell, I decided to take the Lyondell

12  offer.

13          And I relayed back through the

14  headhunter that I -- I have to stop this process

15  because after I started the interview process with

16  Foster Wheeler, I had learned through my interviews

17  with Lyondell that Foster Wheeler was the engineering

18  company; so, it was not ethical for me to continue

19  talking to them.

20          And so, anyway, I was learning; and one

21  week after I got there, they can -- you know,

22  terminated the project manager for the La Porte

23  project that had the hundred million-dollar overrun.

24  His name was Rex West, W-E-S-T.

25          And I had heard via Don Jones

1   primarily -- I mean, he's the one that had the long

2   history -- that, you know, this is pretty common

3   that -- and it's part of the industry that you're in.

4   I mean, you ultimately are the guy that's leading the

5   project, so, you know, they're going to replace you if

6   there's overrun, probably.  Maybe.  Depends on your

7   value, I think.

8        Q.   So, Rex West is one individual whom you

9   allege was --

10       A.   Yeah.  I met him the day I got there to

11  Channelview, after my onboarding; and the next week,

12  he was gone.

13       Q.   And so, his termination is -- is, in your

14  opinion, an example of Lyondell terminating another

15  older employee?  Is that what you're saying?

16       A.   Yes.

17       Q.   Okay.  But you're saying it was because of

18  the cost overruns?

19       A.   Well, I am assuming that.

20       Q.   Right.

21       A.   I don't know.  I wasn't told.

22       Q.   Okay.

23       A.   They didn't talk about why they -- why they

24  let him go.

25       Q.   And you have any other basis to claim that;

Michael Veit
July 09, 2019                                                    118

1    that in your opinion, Lyondell has an history of

2    letting go people who are older?  I think that's what

3    you testified to.

4        A.   I don't --

5        Q.   Or project managers.

6        A.   I don't have any direct knowledge of that.

7        Q.   It's just conversation you had with Don

8    Jones?

9        A.   Yes.

10        Q.   But you can't raise any specific examples of

11    that?

12        A.   No.  Other than West, because that's the only

13    person I met.

14        Q.   When you were terminated in January of 2016,

15    what -- what was -- what was communicated to you, the

16    basis for your termination?

17        A.   It was communicated, one sentence:  "You were

18    hired to right the ship and you didn't right the

19    ship."

20              I thought that's very unusual.  A naval

21    term, you know, being used to me.

22              And I was looking at my notes in the

23    Daytimer.  Those were the exact same references

24    that -- that McFall had said people were saying that

25    about me.  He didn't say that, but he said people were

Michael Veit
July 09, 2019                                        119

1    saying I didn't right the ship.  I thought, "That's

2    very unusual.  Those were his exact same words used by

3    the" -- "Stan Tripp."

4                    I guess they got it from whoever came up

5    with that term.

6                    I said -- and that's all submitted --

7    "Why do you say that Stan?  The ship was sunk when I

8    got there, and I was the best asset you ever had.  I

9    was the only one that could coordinate that project."

10   And I said, "I guess you need a scapegoat."

11                   He said, "No, I don't agree with that,"

12   and that was the end of the conversation, and his

13   hand.

14                   I shook his hand, and that was it.

15        Q.   So, they didn't tell you that part of the --

16   part of the reason that you were terminated was

17   because of your -- you know, the -- your behavior on

18   the project, your ability to communicate with people

19   effectively and lead the project?

20        A.   No.

21        Q.   No?  And so, in your opinion, then, the basis

22   for your termination during that meeting was that the

23   company need a scapegoat?  Is that right?

24        A.   No.  It's a statement that I made to him.  My

25   basis is, age and disability.

Michael Veit
July 09, 2019                                                    120

1        Q.    Well, did you ever tell Stan -- who was in

2   the -- who was in the meeting when you were

3   terminated?

4        A.    One -- one person besides Stan Tripp.  The

5   Sigvalia [verbatim], I think -- no.  Signoval --

6   Signalo -- lovilla [verbatim].  She's in the -- she's

7   a human resources manager for the global projects

8   group; at least, that's what she was.

9        Q.    Mm-hm.

10       A.    Silva -- I've heard --

11       Q.    Is her last name Silvagnoli?

12       A.    Yeah.

13       Q.    Okay.

14       A.    I think you have it correct, yeah.

15       Q.    Okay.  So, it was just Mr. Tripp and

16  Ms. Silvagnoli?

17       A.    Yes.

18       Q.    Okay.

19       A.    Small conference room.

20       Q.    And Mr. Tripp just told you, "You didn't

21  right the ship."

22              You said, "The ship was sunk, and I

23  guess you just needed a scapegoat"; is that right?

24       A.    I said that to him, yes.

25       Q.    Did you ever -- did you ever, during your

Michael Veit
July 09, 2019                                        121

1    employment with Lyondell, make any complaints that the

2    company was discriminating against you based on your

3    disability?

4        A.   I didn't state that to them at all that day

5    because that was the last day there.

6        Q.   Well, let's not just focus on your

7    termination day; just, any time during your -- during

8    your tenure at Lyondell, did you ever complain or make

9    any kind of formal, you know, complaint that you felt

10   like you were being discriminated against based on

11   your disability?

12       A.   I -- I never filed any formal complaint,

13   never stated it.

14       Q.   And did you ever feel that way during your

15   employment?

16       A.   No.  I was thinking I was doing a great job.

17   The project was coming around, and we were recovering,

18   so I didn't -- I mean, I don't think I would have said

19   something like that.

20       Q.   Well, in -- in your opinion, the project was

21   coming around, right?

22       A.   The project was coming around, yes.

23       Q.   But didn't the company do a cost reestimate

24   at the end of 2015 and 2016?

25       A.   This -- this is a very important point that

Michael Veit
July 09, 2019                                            154

 1      A.   Yes.

 2      Q.   "This communication conundrum was a central

 3   issue ... was never addressed by Tripp."

 4      A.   That's correct.  What was not addressed was

 5   the fact that capital project was in charge of -- the

 6   capital projects group was in charge of the capital

 7   project.

 8      Q.   Okay.  So, there -- there was a -- a

 9   communication conundrum, in your words, right, that

10   you're acknowledging, yes?

11      A.   Yeah.

12      Q.   Mr. Tripp tried to address it.  He organized

13   a full-day seminar.  You said so right here.  And

14   we've -- we've -- we've talked about, too.  We've --

15   he organized a full-say seminar on that issue which

16   you say was a joke --

17      A.   It was --

18      Q.   -- right?

19      A.   -- a joke.

20      Q.   Was it?  Was it a joke because you showed up

21   late and everybody --

22      A.   No.

23      Q.   -- else was waiting on you?

24      A.   No.

25      Q.   Or what was the joke?

1      A.   No.  It was a joke because nothing resolved

2  from that meeting.  The meeting was to try to

3  basically take over the project.  They put it in a

4  guise that it was some kind of coordination and

5  cooperation meeting between the event manager.  No.

6  There was a mixup from day one, fostered by Tripp, of

7  the word, "event manager."

8            The people that actually came up with

9  that term that did the readiness assessment, I had

10  lunch with them one day, the head of that group.

11            They said that they went down to Corpus

12  one week after Cain came on board, and I was already

13  coming to the project -- no, I was coming to the

14  project; I hadn't been there yet -- and told Cain that

15  the definition of "event" is what happens at the

16  shutdown; at the shutdown, when the coordination of

17  all the different aspects of the project -- capital,

18  small projects, turnaround -- was under -- was the

19  definition that they envision when they made that term

20  "event manager," not getting documents and interfering

21  with the engineering and construction efforts, which

22  they did, you know.

23      Q.   I don't understand how that's the basis for

24  your statement here in your rebuttal that the

25  communication meeting or seminar that was conducted

Michael Veit
July 09, 2019                                            156

1   for that full day was a joke.

2       A.   Stan --

3       Q.   So, let -- whether -- let's -- let's go this.

4            There were a lot of other people at

5   that -- at that seminar, correct?

6       A.   No, there were not a lot of people.

7       Q.   Well, then --

8       A.   There was four --

9       Q.   -- can you identify --

10      A.   -- total.

11      Q.   -- who was there?

12      A.   Huh?

13      Q.   Who was at the seminar?

14      A.   Don Jones, the destruction manager.

15      Q.   Mm-hm.

16      A.   He will wholeheartedly agree with me.

17           Alan Valenta, Mike Cain and Randy Tatum

18   and Tripp and myself, and Pat McFall.

19      Q.   Okay.

20      A.   And Pat McFall was always supporting my

21   position and my responsibilities.

22      Q.   Okay.  But there are a -- there are a number

23   of -- number of people at that meeting, and it -- it

24   sounds like you're the only person that didn't

25   bring -- that didn't take anything out of it.

Michael Veit
July 09, 2019                                                    157

1        A.    No.   I took out of it the fact that nothing

2    was resolved.

3                  Nothing was resolved at that meeting.

4        Q.    Did you show up to that meeting on time?

5        A.    Yes.   As far as I remember, yeah.

6        Q.    So, whole group wasn't sitting there, waiting

7    for you for two hours to get started?

8        A.    No.

9        Q.    All right.

10       A.    Don't remember that.

11       Q.    All right.   "The morale of the GP" -- let's

12   keep reading the same paragraph.

13                  "The morale of the GP Construction

14   Manager at the site" --

15       A.    Mm-hm.

16       Q.    -- "was going too fast and I sincerely

17   thought this was a mistake I had made in coming to

18   this quagmire in the Lyondell project."

19                  What does that mean?

20       A.    Mm-hm.  Mm-hm.  Well, I made a mistake

21   joining Lyondell and having this dumped on me.  But --

22       Q.    Meaning, having what dumped on you?

23       A.    The project.

24       Q.    Well, I --

25       A.    They were not honest, and then they tried to

Michael Veit
July 09, 2019                                                159

1        Q.   So, what is it that you allege that they

2   didn't tell you?

3        A.   They didn't tell me that they -- well, more

4   than likely, they couldn't tell me because they didn't

5   have any understanding that the estimate that they had

6   put together was incorrect, the schedule was

7   incorrect, the fact that they had selected an

8   engineering company that did not have the

9   qualifications to do this job.

10       Q.   Did you ask any of those --

11       A.   They were beginning to understand that after

12  I came and started pointing things out.

13       Q.   Did you ask any of those questions before you

14  were hired?

15       A.   No.

16       Q.   Go to the next page, Page 8.

17            You and McFall are friends, right?

18       A.   We're what?

19       Q.   You and McFall are friends, right?

20       A.   We were, yeah.

21       Q.   But you're not friends anymore?

22       A.   I wouldn't be his friend now, no.

23       Q.   No?

24       A.   Hm-mm.

25       Q.   Well, at this time, you know, when you were

Michael Veit
July 09, 2019                                                    160

1   working for Lyondell, were you friends with him at

2   that time?

3        A.   Oh, yes.

4        Q.   Yeah?

5        A.   Mm-hm.

6        Q.   All right.  At this -- at the top of this

7   page, you say --

8        A.   Mm-hm.

9        Q.   Well, not the top of the page.  Second

10  paragraph on Page 8 --

11       A.   Yeah.

12       Q.   -- "Tripp and McFall are both the epitome of

13  wannabe, weak, political [verbatim]" -- "politically

14  motivated 'survivors' without expertise in the

15  principles of project execution management."

16       A.   Yes.

17       Q.   What's that about?

18       A.   Well, that's exactly in the same context that

19  I -- they were not really understanding of the

20  execution process, even though, you know, execution

21  plans were issued for the project, which you reviewed

22  before I even joined Lyondell.  They were well

23  written.  They were pretty much the same as many other

24  companies.

25            But they didn't have an understanding,

Michael Veit
July 09, 2019                                                    161

1    until I kept pounding, of what was needed in order to

2    move the project forward.

3                    And they were politically motivated, of

4    course.  I mean, survivors.  That's why Tripp, in my

5    opinion, finally gave up the fight.

6        Q.   What do you mean, they are politically

7    motivated?

8        A.   Survivors.  I mean, they're not going to make

9    waves.

10                   They both had just joined Lyondell, just

11   like I did; and you know, he -- from the standpoint of

12   survival, is what I mean.

13       Q.   I don't understand what you're saying.

14                   What do you mean, they were survivors?

15       A.   They did -- they didn't fight to maintain

16   control for the global projects group to run the

17   project.

18       Q.   You mean, in your opinion, they didn't?

19       A.   In my opinion.

20                   All of this is my opinion, right?

21       Q.   Okay.  Let's go to Page 10.

22       A.   Mm-hm.

23       Q.   All right.  Here, you are talking about

24   Mr. McFall again, in the middle of the -- middle of

25   the page.

Michael Veit
July 09, 2019                                          198

1        Q.   All right.  And do you know what Lyondell's

2   policy is in terms of when they're contacted by -- by

3   potential employers about hiring a former employee of

4   the company?

5                  MS. ROBERSON:  Objection --

6        Q.   (BY MR. HAYS)  Do you know what the policy is?

7                  MS. ROBERSON:  Objection; speculation.

8        Q.   (BY MR. HAYS)  You can answer it.

9        A.   Do I know the Lyondell policy?

10       Q.   Mm-hm.

11       A.   I've never read the policy.  I'm not aware of

12   the specific wording of the policy.

13       Q.   Okay.  Earlier, we talked about a meeting

14   between -- that Stan Tripp coordinated, that you

15   thought was a joke.

16       A.   Yeah.

17       Q.   And you said so in your --

18       A.   Yeah.

19       Q.   -- your statement to the EEOC, right?

20       A.   Mm-hm.

21       Q.   Was Kim Foley the person that coordinated

22   that meeting?

23       A.   Yes.  Yes, he [verbatim] was.

24       Q.   And --

25       A.   Now I remember that.  Yes.  He was the

Michael Veit
July 09, 2019                                                    199

 1   coordinator.

 2       Q.   And what was Kim's role at the meeting?

 3       A.   He was just a facilitator posing the

 4   questions.

 5       Q.   Kim Foley is a female, correct?

 6       A.   Yes.  Yes, you're right.  Now I remember.

 7       Q.   Okay.  And she was an employee from a

 8   different part of Lyondell, right?

 9       A.   I think so, yes.

10       Q.   And she was brought in to facilitate this

11   meeting --

12       A.   Yes.

13       Q.   -- to try to get to the bottom of what the

14   communication issue was, right?

15       A.   Right.  On the definition of "event manager."

16       Q.   And so, your testimony is that the meeting

17   that Kim Foley tried to coordinate was a joke?

18       A.   The result of it.  The interactions that were

19   happening at the meeting.  We didn't move off of the

20   difference of opinion.

21       Q.   Why do you think that is?

22       A.   Why?

23       Q.   Yeah.

24       A.   Because I think the intransigence of Randy

25   Tatum and Mike Cain and Allen Valenta determined to --

Michael Veit
July 09, 2019                                                    204

```
 1   right?

 2       A.    Yeah.

 3       Q.    And then you've alleged age discrimination --

 4       A.    Mm-hm.

 5       Q.    -- under the Age Discrimination Employment

 6   Act, right?

 7       A.    Right.

 8       Q.    All right.  You also have -- there's a couple

 9   references to Title 7 in your -- in your complaint;

10   but you're not bringing a claim under Title 7, too,

11   are you?

12       A.    Please explain.

13       Q.    Well, Title 7 is another -- another

14   discrimination statute.  You're bringing your claims

15   under the age discrimination employment statute,

16   right?

17       A.    I'm bringing my claim related to --

18       Q.    Age discrimination.

19       A.    -- age and disability, right.

20       Q.    And you don't have a Family Medical Leave Act

21   claim, do you?

22       A.    I don't know if it could be rolled in with

23   this because they chose to give me family leave,

24   Lyondell did, but they didn't honor the requirements

25   of FMLA.
```

Michael Veit
July 09, 2019                                           205

1      Q.   But I'm asking, have you brought a Family

2   Medical Leave Act claim in this lawsuit.

3      A.   No.

4      Q.   Okay.  So, the only claims you have in this

5   lawsuit are your age discrimination claim and your

6   disability discrimination claim, correct?

7      A.   Yes.  Correct.

8      Q.   And the basis for your disability

9   discrimination claim is that -- I believe you

10  testified to this earlier; is that the company

11  basically decided that you were -- your disability

12  would create a liability.

13                    Is that right?

14     A.   Yes.

15     Q.   Is there any other basis for your disability

16  discrimination claim?

17     A.   I think they didn't think that I was healthy

18  enough to do a big project under stress like I was.

19                I would work every day, almost,

20  including weekends, a lot of times, until 7:30,

21  8:00 o'clock minimum before I'd go home.

22                I might not arrive in the office.  I was

23  kind of -- I would sometimes arrive at 8:30 instead of

24  8:00 o'clock; but I was putting in about 60 hours a

25  week for the company.

Michael Veit
July 09, 2019                                            206

1        Q.   And so, it -- it's your testimony, then, that

2   the basis for your discrimination claim based on your

3   disability is that the company -- like you said, the

4   company just decided for you that your disability

5   created job-limiting -- you know, some kind of job

6   limitation?

7        A.   Yes, I believe that that is true.  They were

8   paying me a high salary, and I couldn't fulfill that

9   kind of role that I had at capital project for

10  Lyondell --

11       Q.   And --

12       A.   -- at Foster Wheeler's office.

13       Q.   And you don't have any other basis for your

14  disability discrimination claim?

15       A.   No.  They didn't give me any lack of facility

16  to, you know, make sure I didn't exert myself or lift

17  25 pounds, no.

18       Q.   And what about your age discrimination claim?

19  What's the basis for your age discrimination claim?

20       A.   I think it goes in hand with the disability

21  in that, you know, I'm one of the older individuals on

22  the project, and, you know, they thought that I was

23  seeking pretty quick retirement; that I would leave,

24  you know, 70 or whatever.

25            And so, they had a history of pushing

Michael Veit
July 09, 2019                                    217

1   while you were still employed, or was this after?

2       A.    Both.

3       Q.    Okay.

4       A.    Both.

5       Q.    And, well, I mean, what's the significance of

6   that?

7       A.    Well, I think that he was -- well, McFall

8   wasn't calling me; and he was more or less kind of

9   checking on my health, I guess, from a standpoint of

10  how I was doing.

11      Q.    Well --

12      A.    He had suffered a major heart attack and a

13  triple bypass, et cetera.

14      Q.    So, maybe he was -- I mean, it's clearly

15  possible that he was asking you how you were doing

16  because he was concerned about you.  He was a friend,

17  he'd been through it before, and just wanted to know

18  how you were doing, right?

19      A.    Correct.

20      Q.    Right.

21      A.    He stopped all that communication after the

22  EEOC charge.

23              Through 2016, he was still communicating

24  with me.

25      Q.    But he wasn't a Lyondell employee when you

Michael Veit
July 09, 2019                                    219

1    and look up "Michael" -- "Michael Veit EEOC" --

2        A.   Right.

3        Q.   -- "charge," and yours is going to come up?

4        A.   He may have been told by McFall.  I don't

5    know.

6        Q.   But he wasn't a Lyondell employee at that

7    time anyways, right?

8        A.   True.  But they continued to have --

9        Q.   You also said that -- that Pat McFall -- you

10   said in a couple of places, in the lawsuit, and then

11   in your discovery responses, that Pat McFall suggested

12   on multiple occasions, before your heart attack --

13       A.   Yeah.

14       Q.   -- and after, that you retire?

15       A.   Yeah.

16       Q.   Was worried about your health, and things

17   like that, right?

18       A.   Yeah.  He would put in it that phraseology,

19   yeah.

20       Q.   And when -- and, I mean, you and McFall were

21   friends, too, right?  And he -- y'all are about the

22   same age.  He's eight years younger than you.

23       A.   Mm-hm.

24       Q.   So, I mean, it's -- it's at least possible

25   that he was asking those questions or making those

1   suggestions as your friend, right?

2       A.   Yes.

3       Q.   Yeah.  So, you don't -- you don't allege that

4   he's saying, "Oh, you should retire" or "You

5   should" -- you know, "You should think about your

6   health," or, you know, "Think about retiring," because

7   of some kind of nefarious purpose on behalf of the

8   company, right?

9              MS. ROBERSON:   Object --

10      A.   Well, it's --

11             MS. ROBERSON:   -- speculation.

12      Q.   (BY MR. HAYS)  You can answer it.

13      A.   It -- it would be possible that him working

14  for Tripp, that they wanted me to remove -- be

15  removed.  And it would be very easy.  Had the heart

16  attack, had the health issues.  "Why don't you just

17  retire?"

18      Q.   Yes.

19      A.   Or make me resign.

20      Q.   You said in your responses and your

21  lawsuit -- well, in your responses, for sure --

22      A.   Mm-hm.

23      Q.   -- that he recommended you or that he, you

24  know, said, "Hey, you should think about retiring

25  before you had your heart attack," right?

Michael Veit
July 09, 2019                                          223

1              WITNESS CORRECTIONS AND SIGNATURE.

2           Please indicate changes on this sheet of paper,
      giving the change, page number, line number and reason
3     for the change.  Please sign each page of changes.

4     PAGE/LINE        CORRECTION      REASON FOR CHANGE

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23           _____

             MICHAEL VEIT
24

25

Michael Veit
July 09, 2019                                                    224

1              S I G N A T U R E   O F   W I T N E S S

2

3        I, MICHAEL VEIT, solemnly swear or affirm under

4    the pains and penalties of perjury that the foregoing

5    pages contain a true and correct transcript of the

6    testimony given by me at the time and place stated

7    with the corrections, if any, and the reasons therefor

8    noted on the foregoing correction page(s).

9

10

11                    _____

                      MICHAEL VEIT

12

13

14

15

16   Job 301775

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3
       MICHAEL J. VEIT            )
 4                                )
          Plaintiff,              )
 5                                )   CIVIL ACTION
       V.                         )   NO. 4:18-CV-00576
 6                                )
       LYONDELL CHEMICAL          )
 7     COMPANY                    )
                                  )
 8        Defendant.              )

 9
       THE STATE OF TEXAS :
10     COUNTY  OF  HARRIS :

11         I, MENDY A. SCHNEIDER, a Certified Shorthand

12     Reporter in and for the State of Texas, do hereby

13     certify that the facts as stated by me in the caption

14     hereto are true; that the above and foregoing answers

15     of the witness, MICHAEL VEIT, to the interrogatories

16     as indicated were made before me by the said witness

17     after being first duly sworn to testify the truth, and

18     same were reduced to typewriting under my direction;

19     that the above and foregoing deposition as set forth

20     in typewriting is a full, true, and correct transcript

21     of the proceedings had at the time of taking of said

22     deposition.

23              I further certify that I am not, in any

24     capacity, a regular employee of the party in whose

25     behalf this deposition is taken, nor in the regular
```

Michael Veit
July 09, 2019                                                          226

1   employ of this attorney; and I certify that I am not

2   interested in the cause, nor of kin or counsel to

3   either of the parties.

4

5          That the amount of time used by each party at

6   the deposition is as follows:

7              MS. ROBERSON - 00:00:00

8              MR. HAYS - 03:13:19

9

10          GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
    this, the 17th of July, 2019.

11

12                    *Mendy Schneider*

13

14          _____
            MENDY A. SCHNEIDER, CSR, RPR
            Certification No.:  7761

15          Expiration Date:  12-31-20

16

17

    U.S. Legal Support, Inc.
18  Firm Registration No. 122
    363 North Sam Houston Pkwy East
19  Suite 1200
    Houston, TX 77060-4001
20  713/653-7100

21

22

23

24

25