EXHIBIT TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

**CIVIL ACTION NO. 4:18-CV-00576**

# EXHIBIT D

Michael Veit
14719 Waynewood Drive
Cypress, Texas 77429
Cell: 281 650 2789


July 30, 2017


Investigator Lucia Pan
U.S. Equal Employment Opportunity Commission
Houston District Office
1919 Smith Street, 7th Floor
Houston, Texas 77002


                    Re: Lyondell Chemical Company
                        Statement of Position Letter dated February 1, 2017
                        EEOC Charge: 460-2017-00474


Dear Investigator Pan:

This letter is in response to the Lyondell Chemical Company Statement of Position Letter dated February 1, 2017 and which I received via email from you on May 12, 2017. The statements by Lyondell Chemical Company in the response of February 1, 2017 letter are blatantly false and represent a defense without merit to my EEOC Charge of Age and Disability discrimination filed on November 2, 2016. On December 10, 2015 my performance review was good and no negatives were stated to me. I have a complete written record of that review. My termination by Lyondell was a major surprise to me and coworkers.

I very strongly maintain that Lyondell Chemical Company did discriminate against me due to my age and disability after my return to work following medical leave in the summer of 2015. In fact, the false allegations made by Lyondell Chemical Company provide a clear basis for expanding beyond the EEOC Charge of age and disability discrimination to include defamation (slander/libel).  It is my opinion, that direct actions were taken by the company against me which did limit any future employment opportunities. I have not been able to find employment and my family has had to endure an extreme financial hardship.

In the following paragraphs, I will explain in detail why t the allegations listed in the February 1, 2017 Statement of Position are not factual. They are a totally false account and a misrepresentation of performance in the role and what actually occurred on the Corpus Christi Ethylene Expansion Project. First, I will provide a background to my hiring by Lyondell Chemical Company in late August, 2014 to run the project at the Amec Foster Wheeler (AFW) office.

I was initially contacted by Lyondell Manager of Projects, Pat McFall, in April, 2014 to join Lyondell and as he put it, "help salvage the CC Expansion Project". Pat McFall had joined Lyondell in February 2014 having been hired by Stan Tripp, the Director of the Global Projects Group. McFall and Tripp had worked together in the Mideast several years previously. The Global Projects Group (GP), prior to Tripp joining

1

the company, was not a separate department from Plant Engineering. Many previous poorly executed projects led to establishment of the GP group by Kevin Brown. Brown hired Tripp in early 2013 to be in charge of providing the needed oversight and better project management.

As an employee of Honeywell, I was well situated and planning a later retirement that year. It was stated to me by Pat McFall that the project needed a strong client team leader with extensive project management experience that could guide the project and put it back on track. After several conversations and interviews with Lyondell Executive Management, I accepted the offer of employment in July, 2014. Lyondell Chemical Company Executive Management had assessed that my background and skills did meet the requisite requirement needed to lead this important project.

I was unsure of the true status and what unknowns there were regarding the CC Expansion Project. I had been informed by both Tripp and McFall that the detail design phase of the project was in serious delay with no baseline schedule established yet. Amec Foster Wheeler was awarded the detail design phase in October, 2013 but had failed to properly begin working immediately to learn the scope and basic design. They had never done an ethylene project much less a project so complex as was the CC Expansion Project.  Many aspects and status of the design neither Tripp nor McFall comprehended I would learn later. They said there was no leadership and execution experience being provided by either Lyondell or AFW. Pat McFall also, during those discussions, used very disparaging and degrading personal remarks about each of the Lyondell team members residing at the AFW office.  Immediately I realized that I would have a lot of morale repair to do with the team. I had seen this side of McFall in the past.

As noted in Lyondell Chemical Company Statement of Position, the role I had was to interface with AFW and the client team of Lyondell that had been assigned to the project by Stan Tripp. Within a short time I learned very surprisingly that indeed the project management by Lyondell team was very ineffective in the administration of the contract with Amec Foster Wheeler. Moreover, AFW was making no measureable progress on the design. There was incredibly "no sense of urgency" focus by either the AFW or Lyondell team. I reported these exact words to Lyondell Executive management in the third week on the project when I was asked in a meeting with Kevin Brown, Tim Roberts and Stan Tripp at the AFW office to say what I thought was the main observation in my short time on the project.

Kevin Brown, Lyondell Executive VP, selected Amec Foster Wheeler because they had quoted and forecasted a much lower cost for engineering and design than had been quoted by Technip who had done the Front End Engineering Design (FEED) after completing also the basic design package. This decision by Brown and supported by Tripp was ill fated and was done without a critical due diligence of AFW. This would have led to understanding the major risks associated with selecting a very inexperienced company that had never done an ethylene project and had one process engineer assigned who had knowledge of the process design. He left AFW soon after the award and went to KBR. This was an serious failure to perform risk assessment that is mandatory for such a strategic and key Lyondell project. The company was negligent in applying industry best practices. This decision proved to be the prime catalyst to critical AFW design errors and later to Lyondell construction mismanagement issues and increased costs.  I will elaborate on in these comments.

The sanctioned project budget established by Lyondell and approved by Brown and Tripp was woefully inadequate and was accompanied by an unrealistic schedule to complete. Complicating this was also the plan to do a maintenance turnaround and many significant small plant projects in parallel to the CC Expansion capital project. The CC Expansion Project, separate from the other work was approved at a total installed cost (TIC) of $601MM and planned to be completed by late November, 2015. Logical

2

thinking did not play a part in the very aggressive plan. The final TIC cost, I was informed by reliable sources was between $1.1 to 1.2B. These results to my knowledge have never been publically reported so I would not know true actuals. The project was reported in the press completed in January, 2017, 14 months late. Operational problems were reported in February, 2017 and full design potential never has been realized and thus there has been an attendant loss of market share and revenue for Lyondell.

Amec Foster Wheeler was selected to perform this very important world class project charted to convert the key Lyondell ethylene asset, CC ethylene plant from a liquid cracker to a gas cracker and double the capacity of the ethylene product sales in an advantaged market cycle. The relatively abundant and inexpensive supply of the ethane feed due to shale gas exploration increase provided the impetus towards a first to market strategic goal for Lyondell. As previously emphasized, AFW was without any ethylene project experience and this was very complex and large with a congested operating area where much of the pre turnaround work needed to be done prior to shutdown planned for September, 2015.

Technip had issued a limited FEED developed from a basic design package in February 2014, and was tasked to provide any required liaison with AFW during the transition to the detail design phase. Technip also provided the estimated material quantities and had participated with Lyondell to purchase most of the long lead critical equipment prior to the transfer of procurement responsibility to AFW who acted as agents for Lyondell. The material quantities were generated by Technip and issued to Lyondell. Lyondell and Technip worked together to produce the cost estimate but it was primarily the work product of the Lyondell estimators assigned. The low cost estimate would lead to the insufficient appropriation budget and a schedule date for field activities to commence which was never realistic. Lyondell did not demand a cost estimate to be produced by AFW to order to validate the budgeted cost and would not provide the budget estimate details to AFW.

At the point I was hired August 26, 2014, the AFW design had made negligible progress although inaccurately being reported that they had made significant progress. Lyondell had operations representatives in the AFW office for six months prior. I identified a major disconnect upon initial discussions with the acting Project Manager, Moulton and Engineering Manager Etter during the first two weeks on the job. Etter stated that the baseline schedule had just been issued by AFW. I studied it and found that it was not consistent with the Lyondell plan and it was already two months behind the dates for several milestones listed on it.

The depth of inexperience in capital project execution of the Lyondell team was very apparent. The Lyondell team members were technically astute and knew the design but just did not have execution backgrounds. They had all dealt primarily with small plant and maintenance turnaround projects. McFall had also just hired four supplemental project control contractors to help with the scheduling, thus adding resources to the in house Lyondell team under Moulton and Etter.

Etter was a very detail orientated engineer with little aptitude for understanding his functional management responsibilities. Moulton made the statement to me on my first day at the AFW office that AFW was "Charlie's baby". He said he stayed out of his way. So again, I asked of the person I was replacing, "What do you do on the project" as he took his feet off his desk, "I provide morale support to Charlie Etter, and get the required resources when he asks". Etter, the same day informed me at 3:00 pm when I asked to have an introductory review, that he thought it was important to meet with me as I was now assuming the lead role. And he said "I want you to know that I am giving up my spinning [bicycle exercise] class to talk with you today". I said thank you. Later that week, when I asked what does Tim Crenshaw the assigned Instrumentation and Electrical Manager do on the project, Etter stated

VEIT00019

that "he works his 40 hours and no more because the last Lyondell project he had as the Project Manager stressed him out and he was blamed for the budget and schedule failures". I am not making up these dialogues.

Charlie Etter spent some of his unpaid time at home on weekends, approving each AFW man-hour timesheet. I tried many times to rectify this situation by assignment to our contracts manager but to no avail. Etter was a very hard worker, and I had hoped he would dedicate himself to the more critical functions as the Engineering Manager. However, he was always preoccupied with the paper side process and procedures of project work, but not the real coordination and monitoring of the AFW activities that was needed.  He failed in his responsibilities to Lyondell as the Engineering Manager accountable for the Corpus Christi Expansion Project.

There were many additional dysfunctional positions of the team that needed to be changed. The Project Controls function was being handled by Moulton and not the assigned Project Controls Manager (PCM), Charles Follmer, who was member of staff of David Albosta, Global Projects Director of Project Controls and Estimating. Albosta interestingly had been fired by AFW I was told, but still was hired by Stan Tripp to lead GP Group department.

Moulton, the Project Manager (PM) I was replacing had been with Lyondell for 25 years and had an Associate Director, M1 level title. He was also the former Lyondell Manager of Project Controls. Moulton had never had a Project Manager role on a project according to Etter. Tripp assigned Moulton to Lyondell's largest project in history at the start of the FEED phase performed by Technip. Charlie Etter who was Project Manager for the Basic Design (BD) phase by Technip was replaced by Moulton, and assigned to be the Engineering Manager (EM) under Moulton. They continued on to same assignments at AFW for the detail design phase. Charlie Etter was in effect still running the project.

I informed McFall and Albosta at the end of September, 2014 that we needed to replace Follmer with an experienced Project Controls Manager. I also stated this to Moulton who remained on the project for six weeks after I started based upon my request. Moulton agreed that Follmer was not effective in the position but said if I tried to replace him all Lyondell personnel would request to leave the project. I informed both Tripp and McFall of what Moulton had relayed to me. They expressed surprise but no further assistance offered. When no viable candidate was found by Albosta,  I decided to stay with Follmer because as Moulton informed me that same day, Follmer is all I have on the team that knows where the bones are buried so to speak regarding the budget allocations. Neither Follmer nor Albosta knew whether the estimate figures were close in accuracy.

The Project Execution Plan (PEP) drafted by Lyondell during during the basic design phase was a good standard company plan on paper. It was not implemented by McFall and the Lyondell team at AFW's office. It needs to be clearly understood that capital project budget, planned schedule, project controls plan, construction contracting strategies, issue of a risk register, and including a readiness assessment report, Independent Project Analysis (IPA) study  were all set prior to me joining the team. Even with this documentation. I was not responsible for the organization basis set for the project but rather to implement the very flawed plan put in place by Tripp and McFall. Neither Tripp nor McFall provided any oversight to the inexperienced Lyondell team at AFW's office. When the Lyondell team was assigned by Tripp to the AFW office they refused to go, informing him that they could effectively run the project from the Channelview Plant Engineering Center and make weekly trips to AFW for any meetings. Such was the inexperience and naivete of Etter, or was his team's reluctance to travel. Tripp yielded and

4

agreed to pay each GP team member a mileage differential from Channelview to AFW office off I-10. Many were pocketing more than $500 per month additional per diem stipend.

Amec Foster Wheeler team was also very inexperienced as stated previously. The assigned Project Director I knew from the time I was his direct Honeywell client representative for the $30B Petrobras (Brazil) FEED project AFW was executing from 2010 t0 2013. Combined with the shortcomings in the Lyondell team, the project surely was in a malaise when I arrived.

The AFW Engineering Manager was hard working but in the role his first time, and although hard working, was very challenged by the major obstacles on the CC Expansion Project. Many lead engineering and design positions for the different project discipline groups were changed out prior to my joining the project. The musical chairs continued throughout the project. Most of the changes were made at my request starting in November 2014 to June 2015. I had replaced both the Project Manager and the Project Director for AFW by February, 2015. The AFW Manager of Projects was brought in to assist refocusing and driving the project. All of these individuals later in 2016 resigned from AFW.

I had many sessions with AFW Management on the poor AFW team performance. There was also a continuous changing leadership in the AFW Executive Management and Sponsorship. They had major problems with another key project, and Tripp and McFall had the unprofessionalism to advise me to contact the client manager for that project and compare notes on AFW. McFall gave me the contact information. I never followed up on this ethics breach Tripp and McFall promoted.

### Section c.: Mr. Veit's Employment with Lyondell Chemical Company.

The Statement of Position included the following sentence. "In the ADP role, Mr. Veit was expected to develop and foster a highly functioning project team and specifically to complete the following objectives and tasks". A listing of objectives and responsibilities were excerpted from the website Associate Director Projects (ADP) position description, title to which I was requested to submit a formal application, "Project Director- Global Projects" job number 15161(later revised to job number 18141).

The objectives, tasks, and requirements listed were standard boiler plate used by most companies for a senior role and these tasks were already in place through Tripp and the Lyondell Project team before the detail design phase started with AFW.  The objectives, tasks and requirements listing for the position described what I had always fulfilled throughout my career, and exactly served as the reason I was hired. The description was in fact my skill set achieved over my career as an experienced project execution leader. I brought these leadership qualities to Lyondell Chemical Company. I always joked with Tripp and McFall that I was "sent to a poker game and the hand (team) dealt me was only deuces and treys". They always replied" if we had told you the truth about the project, you would have never joined Lyondell". The ADP position I filled was solely created for me in order to match my current Honeywell salary.

At the end of section c, was summarized as the following sentence:  "As described in more detail below, Mr. Veit neither lived up to the portrait he painted of himself in his resume, nor did he fulfill the objectives, tasks, or requirements of the position".  I contend this summary statement is patently false and not only is defamatory but impugns on my character and purposely assails my reputation in the energy industry. This action by Lyondell has directly impacted my ability to obtain employment in the energy industry.

In the next paragraphs, I will provide the real story and reasons the CC Expansion Project was a Lyondell failure and a damaging outcome to its financial results for a long time. The failures did not occur due to

5

any of my actions in performance of the assigned role as the project leader. The outcome was well beyond my influence or control after joining the company.  This project was a great strategic goal but simply not one the Global Projects staff could manage. It was reflected in the incredible lack of credence to how major decisions were made by the Global Projects team. This was a ship that Tripp said I needed to right. As a former naval intelligence officer, I would come to realize soon that it was already sunk before I arrived at the AFW office in September, 2014

Some background to projects history and how it related to the CC Expansion Project will first be noted. The Lyondell Chemical Company has always struggled to bring projects in within a sanctioned budget and established realistic schedule. When I first arrived in late August of 2014, the LaPorte Ethylene Expansion project has just been completed for a like capacity increase and maintenance turnaround as the CC project. This project was advertised initially as a project run by the Global Projects Group under Tripp. The outcome for the La Porte project was a reported overrun of $100MM and was six months late in completion. There was considerable in fighting between the different factions involved in the project. Tripp fired the Project Manager, a very long time employee the first week after I arrived at Lyondell.

The significant failure of the La Porte project was attributed to poor coordination by the GP team and the T/A team who had taken over total control of the project. The management by the turnaround maintenance team was very ineffective. After the debacle, Tripp was instructed by Kevin Brown, Executive VP, in early 2014, that the CC Expansion Project would need to be run by the Global Projects Group under Tripp and Tripp insure the success of the large project by meeting the budgetary and schedule goals. When the project later started to go off the track, I was recruited to recoup the schedule and lead the team at AFW. The PM, Moulton had lost the confidence of Lyondell Executive Management and including Tripp and McFall.

In July, 2014, Lyondell had commissioned a Turnaround consultant to do a "Readiness Assessment" analysis of the Project status and preparation for the September 2015 shutdown. It may not have been too early to perform but it introduced an aspect into the project that certainly did lead to misguided involvement of the plant operations and did indeed contributed to the failure of the CC Expansion Project. This was the same company that had done turnaround (T/A) assessments for the La Porte project. They knew how badly that project had gone.

The report was kept internally company confidential and not issued to the Lyondell CC Expansion Project team. McFall had sent me a copy via email before I joined the company along with many other documents on the project. What resulted from the report was the recommendation for Lyondell to hire an "Event Manager" whose role would be to coordinate the interfaces at the plant site between the Global Projects, capital project team, the CC T/A team lead by Alan Valenta and the Plant operations Group. The term "Event" was conveyed and  interpreted by the consultant to mean the plant shutdown duration time frame which encompassed the capital project work not able to be completed until the turnaround, the plant small projects to be done at T/A and the maintenance T/A activities.

The report was heavily being influenced by Randy Tatum, the Corpus Christi Equistar Plant Manager, gave the name, Mike Cain to hold the "Event Manager" position. Mike Cain had been the CC Plant Manager for seven years and had retired to Kerrville four years prior. He was reportedly involuntarily forced to retire during the last turnaround at the CC Plant due to budget and schedule delay concerns. Randy Tatum was also at the CC Plant as an assistant to Cain at that time. When Cain retired, Tatum was named as the CC Plant Manager. He remained the Plant Manager for the last four years.

6

VEIT00022

Before Cain was formally accepted by Lyondell Executive Management, Tripp had recommended several different project management contacts he knew from industry. Tatum, who was pushing Cain, prevailed because Cain had the right operations background and had a good rapport with the plant personnel. Cain was hired in early August 2014, the same day I had given my retirement notice to Honeywell. He was hired as a consultant through the CDI resources staffing agency, at $320/hour with Cain rate being $160/hour plus providing to him a company car, apartment, and daily living expenses. Also he reportedly received a sign on bonus. Lyondell financial fiduciary responsibility could perhaps be questioned.

So again, the reason I was hired was to bring the project under control in the coordination of AFW. Cain was to coordinate the plant interfaces at the site prior and during the "Event" at shutdown. The GP group would be responsible for all capital project activities executed before (Pre T/A) and during the shutdown time frame. The role of Cain was to facilitate and insure proper coordination was done between the various factions. Cain's role did not include coordination of the AFW engineering and design work. Prior to the shutdown he was to be coordinating the planning of the small plant projects and maintenance T/A work efforts. The T/A group under Valenta had already been at the site planning for one year and basically using the planning template which defined the work activities from the previous four years earlier T/A. The allotted budget to Valenta and the T/A Group, a trusted and influential Lyondell entity again should be questioned in respect to Lyondell fiduciary responsibility.

In the afternoon of my first day, August 26, 2014 at the Lyondell Channelview location doing onboarding, I received a call from Mike Cain informing me that he welcomed me to the project and that I would be working for him, the Event Manager. He further stated that he would be running the AFW phase and had established communication with them. He further stated that there was the August 12 meeting between Lyondell and AFW in which he was so embarrassed by the behavior of Pat McFall who nastily berated the AFW team and Tripp did nothing. Ironically, this was the same meeting that McFall had asked me to attend and I Informed him it was not possible, as I was still an employee of Honeywell through August 25, 2014. I did not respond to any of the Cain commentary because I was not sure if I had been misled by Tripp or McFall. I went to discuss with Tripp and McFall immediately after the call.

Tripp and McFall again reiterated and emphasized that Cain was not correct and that was why I was hired. They said do not worry about it, they will speak with Cain. I stated to them, there seemed to be much confusion introduced by the term, "Event Manager". The term was coined by the "Readiness Assessment" consultant. The consultant had already met with Tatum and Cain at the site in order to discuss La Porte and to clarify the new Event Manager role. This confusion and differences already existing between the plant and GP did further fuel the disconnect and dysfunction occurring at AFW.

During the month of September, 2014, AFW began receiving contradicting instructions to them from Cain and were following, even though I was the assigned contact point and client representative at the office. This was introducing confusion and even allowing AFW to use political tactics against Lyondell. First, I had to realign AFW and control the interface. Future meetings on the capital project were channeled through me, not Cain. It was an immense struggle to extricate Cain from the day to day AFW interface but the chaos was introduced by Tripp. I soon learned Tripp was definitely inept with no leadership acumen. McFall was also weak, speaking loud words in emails only. This communication conundrum was a central issue and was never addressed by Tripp. He even organized a full day seminar on the issue that was a joke. The morale of the GP Construction Manager at the site was going fast too and I sincerely thought this was a mistake I had made in coming to this quagmire in the Lyondell project.

VEIT00023

I have attached several email copies that show the state of communication confusion to all on the role of the "Event Manager" and the Global Projects Group that was told to lead the capital project and coordinate with AFW. The responsibilities and clarification was assumed by me to be set with the issue of a finalized RACI chart in late September, 2014. Tatum and Cain however continued to circumvent my efforts at AFW and at the site in a meeting October, 2014 by telling the GP selected construction contractors that Veit reported to Tatum for this CC Expansion Project, his plant's project.

Tripp and McFall were both the epitome of wannabe, weak, politically motivated "survivors" without expertise in the principles of project execution management. During the course of my tenure at Lyondell, I was truly surprised at the management ineptitude of Tripp and McFall. Kevin Brown and Tripp were reportedly forced out of Lyondell in early 2017. Both were said to be "retired" but Brown purportedly works now for RLG, a consultancy he hired in early 2015 to develop the basis for a claim against AFW for misrepresentation of their credentials to do ethylene design and for the project cost overruns.

Tripp purportedly currently is looking for employment and is in fact, working through the same executive search firm that cautioned me not to leave Honeywell and go to Lyondell. The person had stated to me that Lyondell has a poor industry reputation for retaining good people and has had a lot of turnover in project management resources.

Cain is gone, reportedly pushed out. Moulton is long gone after 25 years at Lyondell. Tatum, McFall and Etter may still be surviving, but also may possibly not be long at Lyondell. I had long predicted that Brown, Tripp and McFall would be asked to leave. Etter would be relegated back to the engineering group for plant projects. McFall had stated to me and Tripp that this was McFall's plan.

Tim Roberts, Executive VP referenced in the Statement of Position was also not long in the company after Bob Patel was chosen as the CEO over Roberts. Roberts did not understand the real issues on the project in my opinion. He was an operations orientated executive with a marketing background. And I thought he was very easily influenced by Tatum and Cain. He did though understand the fallacy of selecting AFW for the detail design phase.  He was usually very quiet at the AFW monthly progress review meetings.

In the above paragraphs, I have provided the background to the project and basis for my hire by Lyondell and occurrences after my joining the project. In the following paragraphs, I will refute the, in my opinion, libel being promulgated by Lyondell Chemical Company to EEOC and perhaps others by Lyondell Chemical Company's Statement of Position,  dated February 1, 2017. I will comment by each section d, e, and f, pages 4 through 10 of 12.

**Section d: "Mr. Veit's Failure to Lead the Expansion Project**

As I have explained previously, the communications difficulty with Tatum and Cain but no others, was due to the lack of role enforcement by Tripp, Director of Global Projects, Tripp was charged with the responsibility to run the CC Expansion capital project. It was misinformation by Tatum and Cain that also I was to take charge and interface for the small plant projects and the maintenance turnaround. Cain and Valenta were responsible for these areas. All of the factions were to coordinate with the construction contractors and produce an integrated schedule through the turnaround. Tatum and Cain wanted to control this effort which was the responsibility of the GP group. This was actually the only area there was a difference of opinion between myself and the two gentlemen, Tatum and Cain.

8

I did not order or request anyone in the Lyondell team to not communicate with the field team. However, Tatum and Cain continued to speak directly with AFW and with the two construction contractors about getting documentation prior to the actual issue. They went around the GP construction manager at site directly to the contractors.  I did for the most part enforce the flow of information through the GP group because of the chaos Tatum and Cain were causing on the project.

Tatum, Cain and all of the plant site team leads were always included in the schedule meetings and other decision meetings for site activities. Cain continued to instruct his staff to bypass me when they could. Etter was especially easy in giving them the preliminary documents. I cautioned Etter to be diligent in giving only correct documentation as was needed at the site. I did not instruct him to not communicate with Cain. Cain was not an admirer of Etter based upon interfaces with him on earlier Lyondell projects. Etter had some failures before the CC project.

Tatum and Cain were always criticizing the GP team, so I tried to build the morale and asked my team at AFW and site to work together as a cohesive team focusing on the AFW design effort. My meetings with the Lyondell team were not "rants" as stated. But I truly had "no closers in the ballgame " and why I had no option but to bring in another engineering company in January 2015 to help us as I have explained later in my comments. There were very serious design execution problems using AFW and Etter always seemed to be stressed and not able to influence AFW in the right direction.

Etter had purposely misled me in October 2014 when I asked him if all of the critical long lead equipment had been procured. He stated that yes they had when it was not true. AFW had miscoded the major tower section fabrication and it still was not procured by AFW. Before I learned this from Etter I had reported the inaccurate status to Kevin Brown in the Lyondell monthly executive steering committee review meeting and after the meeting I had to retract the statement. This purchase order was the critical path of the project and I had to push Etter each week until it was finally procured in late November, 2014. It had been in the quotation and evaluation stage for 9 months.

I sensed that the GP team led by Moulton was very resentful towards Tripp and McFall because I was brought in at the end of August, 2014. They had expressed to Tripp they were doing a good job with AFW and everything was under control.  I tried as best as possible to understand their anxieties and I had very good cooperation from Moulton. He provided a good transition education and frankly seemed relieved he was not continuing on the project. We had a good rapport. I found the statements recorded in the Statement of Position with regard to my interfaces as mostly bizarre. I have never in my career been accused of leading through fear or intimidation.

As reflected by my comments, it is clear that I experienced much frustration and dismay with Etter and the Lyondell team at AFW office. Previously, I commented on the very lackadaisical attitude of Tim Crenshaw. He was a lazy individual and although he reported directly to Etter, there was no accountability. The extremely important I&E portion of the project was very poorly coordinated by Crenshaw. This was one of the most deficient areas of the design by AFW. I fired Crenshaw later in 2015.

Etter was approving thousands of dollars to cover AFW/Lyondell breakfasts on Fridays. This was not required and AFW was splitting the cost and then declined so Etter decided that Lyondell will pick up the total tab. I discontinued the breakfasts. Crenshaw was very upset. AFW showed me an email Crenshaw had written only to the AFW PD stating the project had low morale because of my canceling breakfast

9

action. It was however, not the reason Crenshaw was replaced. His replacement, the bench quarterback, Poston turned out was far more dedicated and more effective working with AFW.

The paragraph on page 7 of the Statement of Position with reference to Tim Crenshaw is an absolute falsehood. The skewed statement that McFall reported in saying Crenshaw was "allowed" to leave the project was surprising to me. Yes, he was allowed to leave the project by me. The real sequence of events was that I informed McFall two days prior to Crenshaw's two week vacation started that it was time for Crenshaw to go. McFall confirmed back immediately that day he and Tripp agreed with my decision. Crenshaw's words that he had planned to retire after enduring his last "stressful" project management assignment may have been true, but this was never mentioned to me. I only knew that Crenshaw was already in "semi -retirement" mode on the CC Expansion Project. Lyondell was allowing him to freeload. There were no other available I&E management resources I was informed by McFall.

I very much resent the accusation in that same paragraph on page 7 that "I treated the Lyondell employees like they were dummies". This is another blatant false allegation in the Statement of Position and is explicitly defamatory. My only assets to use for running the project, was the Lyondell team, and I tried to use them in the most effective roles. The team was not demoralized as asserted by Tatum and Cain in February 2015. They may have felt confused as to why it was so necessary to add the resources from Burns & McDonnell (BMcD) as I will discuss in other paragraphs following.

The real story was in fact, that Pat McFall repeatedly spoke ill not only of Tatum, Cain, Moulton and Etter but each and every one of the team assigned at AFW office. The phrases he used were unbecoming of a person in the position he held at Lyondell. If the Executive Management had been aware, his job would have been in jeopardy. I never shared his words with anyone. I had known of his character flaws for many years, as he worked for me at another company, Stone & Webster (S&W) many years earlier. I continued to get feedback over the years on his same behavior from other coworkers who knew him.

I had given McFall his first career opportunity in project management at S&W in 1988 when I left to go on to Bechtel. In later years, I had gotten him a Project Management position at ABB Lummus for a very substantial salary increase. Later I found out he had embellished his functional work title and position on a KBR project he was working on prior to joining ABB Lummus. He ultimately failed at ABB Lummus too. He did not do well in his stents at Washington Group, Fluor and Jacobs, after ABB Lummus. He does not have the stature for the Global Projects Manager of Projects position he currently has at Lyondell.

During meetings throughout the project, both Tripp and McFall could not meaningfully contribute to the discussions whether it was an AFW review or a Lyondell Steering Committee Meeting downtown. They did talk golf game usually. The reason that Tripp and McFall stated they will continue to keep me on the project through completion at AFW , which was actually my primary end point, was not that it would cause a delay.  I was in effect expediting the project and only after my medical occurrence did in fact, the project did get very much behind under McFall.

The delay reference was incredulous. Why would you retain a person if he was, as asserted, a bad influence on the Lyondell team morale and did not manage the AFW interface?. This statement was nonsense and false of course. It was I who was the prime mover and keeping Global Projects in control of execution with no support from Tripp and McFall. Tripp and McFall were mainly trying to survive the political headwinds coming from Tatum and Cain.

VEIT00026

McFall did not become versed in much of the project dynamics until I had to leave the project. He did not however, have any influence on the work issues of the project. The statement that in late May and early June McFall was spending several days each week at the AFW office is also false. He came maybe one time each week and we would review the list of project deliverables and AFW issues I reported on every week via email to Lyondell management. He did not help with resolution of any issue. Furthermore, McFall never discussed any behavioral issues between me and Etter or any of the team members. He did know the exasperation I had with Etter and that my decision to enlist Burns & McDonnell was wise. He knew in early 2015, how much I had to push Etter to get the process hydraulics and P&IDs issued for construction due to his prior mismanagement before I joined the project.

In late November, 2014, I had fully realized that the project execution management of AFW could not be done solely with the current Lyondell team. I needed to bring on an experienced team to deal with the great many AFW design issues and disarray in the AFW and Lyondell teams.  I informed both Tripp and McFall and requested they approve this action and begin an interviewing process by them and myself. They did inquire of some companies for assistance but no agreements were reached. On December 29, 2014, I drafted a long email from home to Pat McFall stating that the situation at AFW was drastic and I needed to make organizational changes with different resources added to the Lyondell team. McFall never read the email until January 6, 2015 when I had asked him for a response. He also had been on vacation and had issues with his computer access to the Lyondell network.

The Lyondell team at AFW went on a three week vacation during December at a very critical point in the project when many key reviews with AFW needed to be made. I discovered on January 8, 2015 that back in early December, Etter had become aware of a major design error by AFW that would affect the project completion date. Etter had not informed me of the issue to date.

On January 9, 2015 I returned from a jobsite visit, and at AFW office, interviewed an experienced Burns & McDonnell (BMcD) group McFall had arranged to meet. On January 12, 2015 I met with Etter privately and then afterwards with the entire Lyondell team to inform them of the organizational changes to be made. The process hydraulics and P&ID work would continue to be managed by Etter.  The design reviews were to be coordinated by BcMD with AFW and approvals only by Lyondell.  On January 13, 2015 I brought in the BMcD team and held a joint meeting with both Lyondell team members and AFW. Etter and Lyondell team were not happy on my move, but it was very necessary as will be shown.  Etter did some stonewalling. BMcD prevented a potentially dangerous outcome at the Corpus Christi plant.

During the next few months many critical design errors were uncovered by the BMcD engineering team located at AFW. It became clear that the main issue was that Moulton and Etter did not establish a firm basis of design with AFW.  The contract required AFW and Lyondell to define the basis and get it formally approval by Lyondell. After BMcD joined the team they discovered that Etter and others in Lyondell did not have access to the project's P&IDs and that hydraulic checks against the Technip FEED package was never done. It was a startlingly revelation and would have the severest impact on the project. This was a basic tenet never completed by Etter. The P&IDs, the roadmap for the design had never been issued for construction so isometrics could not be issued to the piping fabricator, Turner. Etter had misled me again at serious harm to Lyondell. I had trusted McFall's confident opinion of Etter.

In February, 2015 I fired the AFW Project Director and Project Manager.  The replacement PD for AFW I initially had rejected, but then was assured by AFW Management he could effectively lead the design effort. He had much difficulty doing his job and was not supported by the AFW Management.  He had a hard time in refocusing the AFW team to get the hydraulics completed.  There were very major errors by

11

AFW in civil and structural steel design that needed to be revised and coordinated at site. The piping design was very far behind and delays were often due to misalignment with Turner, the fabricator.

BcMD brought in additional resources to help with not only design issues but many engineering issues but to help Etter close the hydraulic work. Etter was to coordinate the hydraulics and P&ID reviews and approvals. Never in my career had I struggled to get the required results from the responsible individual. McFall had assured me that Etter was a good engineering management talent. McFall apologized several times to me for his misjudgment of Etter's capabilities and stated that he will later remove him from the GP group and reassign him back to the Lyondell engineering group after project completion.

Etter's daily log on status of where the hydraulic and P&IDs were in the progress cycle was always inconsistent with what both AFW and BcMD recorded. During the June 18 meeting referred to by Etter included as attachment to the Statement of Position, he makes accusation that I called him a liar. I absolutely deny any statement as such, and this would be far out of character for me to say that to him whether privately or in any meeting. His email was not a true recounting of what happened at the meeting, a status review of the hydraulics. I asked him in that that meeting to explain why were there differences between all parties' documents. I was not abusive to Etter.

Charlie Etter was very tired on the project by this time, and was under a lot of pressure from me and Lyondell management. Kevin Brown kept up daily with the status. The hydraulics work was completed in late August 2015, and P&IDs issued for construction by end of November, 2015.

In late May, 2015, Lyondell engaged the firm AP-Networks to provide the 9 months readiness assessment for the targeted plant shutdown in late February 2016. This is a common exercise done by Lyondell at specific time intervals before the planned shutdown.  The disadvantage to perform this analysis for the CC Expansion Project was that it was a far bigger and different capital project, not just a maintenance turnaround as typical. The AP-Networks team admitted at the site review meeting that they had never evaluated a capital project. The CC Expansion Project was a $601 MM total installed cost (TIC) capital project and separately an $18 MM small plant projects scope and an estimated $75 MM maintenance turnaround.

Alan Valenta had been provided an upfront budget of $6 MM to prepare for the turnaround and submit an appropriation budget for approval. He had been with a large staff at the site for more than one year at expenditure of a significant sum. There was no planning completed during that time. The planning was to be essentially a copy of the previous turnaround during which Cain was asked to retire or be fired I was told. The previous turnaround had been completed for less than $60 MM.

Until June 2015, the "Event Premise" authored by Valenta had never been issued to the Global Projects Group charged with running the project. It was astounding that neither Tripp nor McFall were ever aware of this document. Sadly, a lot of infighting was taking place within Lyondell.  The document itself was a well written in basic plan, but was originally from the perspective of the turnaround not a capital project as was the CC Expansion Project. Valenta had revised it in June before issue to Global Projects.

AP-Networks issued a report that was inaccurate and did not in any way reflect the capital project status and its direct relationship to the preparation needed for the turnaround. Tripp and brown were not being properly informed by Tatum, Cain and Valenta. The report was certainly not applicable to the capital project. The May 29, 2015 meeting referenced in the Statement of Position was a conveyance of misinformation. Brown, Tripp and McFall were clueless.

12

VEIT00028

On Sunday, May 31, 2015 (copy attached) I wrote a detailed email to McFall with cc to Tripp. My email outlined what was the direction Tatum and Cain were leading the project and emphasized that the project control was being wrested from the Global Projects group as was mandated to Tripp by Brown. I informed them if that was agreed "then I am not your best option for this capital project leader position at CCO. We are headed for a poor outcome and great morale drop in the ranks of the contractors". There was no response from either McFall or Tripp. They were clearly, politically motivated to give up the fight to properly run the capital project to the benefit of Lyondell.

The reference to a May 29, 2015 meeting was I assume to the conference call held from the site for Valenta and myself. I think that Tatum and Cain drove to Houston that morning for the meeting. It was Sam Smolik's first or maybe second review meeting on the project. Smolik called me on June 2, 2015 to get a briefing on the project. I know Smolik had a different take on the project after the call to me. He stated he had not been given the background to the project.

The question posited by Cain about an instruction to my team to not communicate with the site was again denied by me. I categorically deny any dishonesty and the statements in the Statement of Position are in my opinion overtly defamatory. I remember asking Tripp in early June "do you have my back?" and he said I definitely "do have your back". Integrity is an important characteristic of a leader.

**Section e: Mr. Veit Goes on Leave: Mr. McFall Steps In to Lead the Project: Mr. Veit's Shortcomings are Uncovered.**

Of all the statements made in the Statement of Position The above is the most absurd and untruthful. I was most incensed and angry at this defamation.

There were no additional technical problems that had been uncovered by McFall. McFall was fully aware of the many issues from the many discussions I personally had with him as well as the reports issued by BcMD. Most ludicrous and untrue was the statement about the Korean manufactured equipment. He was well aware that the Lyondell team under Etter had not addressed transshipment of the foreign supply. I initiated that discussion with AFW. McFall, in early 2014, was derelict in not understanding or even questioning the late equipment orders without conveyance to the jobsite established by AFW. There were not only these details not arranged by Etter, but also there was an enormous backlog of vendor drawings and key documents not reviewed by the Lyondell team. McFall should have been cognizant of these issues long before I was hired. I pressured Etter continuously on the required actions. These directly impacted the fabrication completion dates and late deliveries.

This paragraph in the Statement of Position also included the unbelievable allegation that I" had no interest in the project cost". I was very incensed at this comment from McFall. Another statement by McFall was that I "had no idea how much the Company had spent to that point, how much was forecasted to be spent and how the spend matched up to the amount sanctioned by the Company's Supervisory Board". These comments by McFall are not only false, they are stupid. I was very aware of these cost categories and filed a corporate financial report each month. Follmer assisted me in documenting the data. During a call to McFall from the hospital he asked me how to do the report, and I told him Follmer will guide you through it. McFall in my opinion has been very disingenuous.

I did not "allow" Amec Foster Wheeler to drive up the costs and extend the schedule. His statements in my opinion are libelous. I certainly was continuously concerned about the project costs and the fact

13

that the Lyondell budget was glaringly inadequate. I still definitely could lead this project, and later it is very clear, McFall could not. He was very "stressed out" when he had to take my place on the project. Once he remarked to the AFW Project Director "I didn't sign up for this". In a phone call to my home during the summer of 2015 he stated, rather surprisingly, "I now understand what you were talking about". McFall does not possess the leadership or the project execution acumen to run a major project in my opinion based on my observation of him at Lyondell. McFall was shielded by Tripp in September 2015, when Jim Nabors was brought in to replace McFall so that McFall could go back to Channelview and continue his administrative functions as Global Projects group's Manager of Projects.

The project's massive overrun in the end was not linked to oversight by me. The cost overrun was in no way or any respect due to my leadership of the project. I did more positive actions for the company than anyone in Lyondell. The genesis for overrun and delay was set long before I arrived at Lyondell. I truly saved Lyondell from excessive engineering cost prior to my medical leave. It was I who ordered the audit of AFW man-hours and put AFW on notice of required staff reductions. This project's potential overrun was actually not believed to be very drastic prior to my medical leave as I will explain in further detail later. The lack of cost control at the site was under the purview of Cain, Nabors, and new, inexperienced construction manager, Roger Scheuring. The AFW design errors impact to the field work was not controlled. The acceleration in construction costs after I left the project was staggering.

The section e. of the Statement of Position ends with stating that "Mr. Veit was not in a management position on the new project". This action by Lyondell was a direct violation of the Federal Medical Leave Act (FMLA) that addresses the restatement to employee's position. This does not refer to an administrative title and pay scale but rather to one's functional title and scope of responsibilities. On the new project there was little responsibility afforded to me. I was placed in a cubicle at a contractor's office with no project assignments. I was indeed being demoted. The demotion by Tripp and McFall was not warranted. I had performed well on the CC Expansion Project.

There was no misconduct by me that took place at any time at Lyondell or with any other entity associated with the CC Expansion or PO/TBA projects. When Lyondell made this claim to the Texas Workforce Commission (TWC) with no example or proof, they were overridden by TWC. I was then able to collect full unemployment benefits for 6 months in 2016. Lyondell's actions and false accusations against me have resulted in my lack of success in obtaining employment in the energy field.

I had a job interview with a company offering potential employment, and afterwards, I learned from the executive search firm recruiter who had arranged the interview, that the company's Human Resources representative had been told by Lyondell that "he left his project before it was completed". Yes, in a respect, that was true due to my medical leave. Lyondell it seems had tried to imply I had on purpose abandoned the project. The recruiter provided names and contact information of two attorneys if needed that handle wrongful terminations cases. Not being able to find employment has resulted in a very damaging financial and stressful burden to my family. We are rapidly depleting our savings. It has severely impacted our lives. My wife works part time as a substitute teacher for $5000 average per year.

**Section f:  The Project Costs are Discovered:  Mr. Veit's Employment is Terminated.**

The section f of the Statement of Position continues, as in the previous sections, to dwell on disparaging my capabilities as a project leader. The allegations made by Lyondell as I have stated previously are patently untrue and are, in my opinion, unfounded and defamatory.

14

The CC Expansion Project, the capital project, went from an approved budget of $601 MM to a final cost exceeding $1.1 B , I was told by a key individual familiar with the growth in cost. It was not the $870 MM stated in the Statement of Position. The funding was actually at $950 MM already in September, 2015 I had been informed.

It is again a false narrative that the project cost overruns were being discovered after I had gone on medical leave. The Lyondell Executive Management was aware of the large financial impact potential in early 2015. This was already a consideration because of the weak performance by AFW and as I have outlined previously, the poor coordination by Moulton and Etter in the Lyondell team at AFW.

After the November, 2014 monthly progress review meeting with AFW, I informed Kevin Brown that the engineering costs AFW had quoted and used in the sanctioned Lyondell budget was very much too low at $33 MM, (5.5% of the total budget). I advised him that the original quotation by Technip of $50 MM may have been low as well, at less than 10%. A major project like the CC Expansion Project would by industry referenced data, usually fall between 10-15%. The AFW monthly progress report for June, 2015 forecasted $57.4 MM engineering cost at completion even with all the rework that was required. The final number was near $67 MM, a difference of $34 MM from original number.

Etter had allowed some questionable change orders to be approved by Lyondell prior to my arrival on the project. He petitioned me immediately the first week that he and his assigned project engineers be in control of approving the AFW change orders as Moulton had agreed. I did not agree as that is the responsibility always of the Project Manager. Moulton via instruction from Tripp I was told, had authorized in earlier in 2014, an additional $2 MM for AFW Construction Management scope and more than $500K had already been expended. The first day on the project at the AFW office I cancelled this change order after consulting with Tripp and McFall. Of course, contrary to what has been alleged, I was always cost conscious as my responsibility to the project and on behalf of Lyondell. The vast majority of the AFW change orders submitted I rejected and did not approve. I am not sure if McFall approved. The budget for AFW was up to end of June reflecting my approval of scope was at $38.4 MM

During the latter part of 2015, Lyondell brought legal action against AFW reportedly with a claim of $30 MM and later reduced to going after $15 MM. I am not aware if Lyondell prevailed with a settlement on the claim for AFW misrepresenting expertise in ethylene design.   The point here is that AFW engineering cost overrun was not excessive. It was the rather the tremendous impact late hydraulics, roll down of the design errors, construction costs escalation through additional required field resources and rework. Those additional costs were after higher costs were incurred for pipe and steel fabrication. Lyondell also incurred great additional staffing and operations cost due to extension of the project and inefficient use of construction resources at the site.

The construction efforts for work outside of the furnaces modifications did not start until late April, 2015 when some civil underground scope started. Little progress was made through June, 2015. It was under the direction of Tripp and McFall, and later, Cain, after Tripp abdicated control, that lays the direct responsibility. Cain was an operations experienced former manager of the CC plant but had absolutely no familiarity with a major capital project and he knew this disadvantage.  He was more the optimistic cheerleader but always in the shadow of Tatum who knew even less.

McFall interfaced with AFW for two months before Jim Nabors was brought in by Brown in September, 2015. Nabors was assigned oversight and coordination efforts at AFW and then asked to relocate to the

VEIT00031

site in order to assist Cain and Roger Scheuring, who had replaced the Lyondell Construction Manager, Don Jones.

I was told that the efforts by Nabors at AFW were effective but he did have several problems interfacing with Tatum and Cain after he relocated to the site. The abdication of the capital project control by Tripp to Tatum and Cain in late June, 2015 was noted by me to the consultant, ePM of Austin, Texas that Tripp had hired for team communication facilitation. I informed him my opinion that the decision will lead to failure and the principal problems at the site was not the GP group but rather the lack of cooperation from Tatum, Cain and Valenta who had little comprehension of the key issues with the capital project.

The Lyondell Steering Committee Report dated May 29, 2015 listed the forecasted project cost at total installed cost of $613 MM for the capital project portion. In June, 2015 it rose to $634 MM although both Brown and Tripp were aware it was moving even higher. The re estimate was already underway. It is untrue that the efforts were initiated by McFall. The piping and steel quantities originally estimated by Technip were very far less than the design was generating. The original shortfall along with much fabrication rework for both commodities directly translated to significant construction cost increases.

The higher cost trending was the subject of the reporting by Brown in the Lyondell Board Meetings. He was continually challenging Tripp for accurate numbers. The cost was a major concern of course to Bob Patel, the newly appointed CEO. Bob Patel visited the Corpus Christi job site on June 10, 2015 for the annual safety day observance. Prior to lunch that day outside the lunch tent, I first met Bob Patel who was being escorted by Tatum. Patel asked me where I thought the cost was headed for the capital project. I told him about $654 MM which was the number clearly evident in early June. I was to meet with him later that day, but Tatum did not relay my message, so no meeting took place that day at site.

I had a separate meeting with the CEO Bob Patel on June 12, 2015 at the downtown Lyondell Tower. Bob Patel at that meeting said to me all are "depending on my leadership and good communication with all parties at the plant site" and that he looked forward to the shutdown scheduled for February, 2016. I told him that it would not be possible before the end of September, 2015 that we can firmly confirm that schedule as it would depend on the extent of pre turnaround work that could be completed in 2015. I assumed that the prime thing Tatum and Brown were communicating concerned the communication issue and not the critical issues.

I am not sure what was informed to him at the June 26, 2015 Steering Committee Meeting as I was checked into the hospital in Houston after my June 25 heart attack at the job site. Ironically, although it started earlier and I attributed to indigestion, it was still occurring while I was having a good meeting with Tatum and Cain. That evening I drove back home to Houston and checked into the hospital the next day after a visit to the emergency room. After placing the stent, my heart surgeon ordered a second surgery to remove a lemon size aneurysm in my heart that has a low survival rate. It was due he said most likely to delay in seeking the care needed after the symptoms in Corpus Christi. The survival rate for the type and size aneurysm surgery I had endured was 1:1500. So my case is in the record book.

The reasons for the cost overruns and schedule delay can be understood from the reason I was recruited to Lyondell by Tripp and McFall. The coordination had not gone well at AFW. The Lyondell team was not experienced in project execution and AFW was not making progress in the design work because they did not have resources familiar with an ethylene design. The basis of design was not established with AFW and there was no follow through with the hydraulics to establish final piping scope. This in turn did not allow the P&IDs to be issued for construction and finalize the 3D models for Lyondell approval, and the

16

design could proceed to support a timely pipe fabrication plan. Fundamentally, the problem was always that before my employment, the Lyondell team at AFW provided little oversight function.

There was an implicit trust in the Technip/Lyondell generated cost estimate. Lyondell believed it was a reasonable number based upon results and historical data from the La Porte expansion project. However, the CC Expansion Project was not similar due to the redesign from a liquid to a gas cracker. Technip had used a template project for a gas cracker expansion and added the required equipment for the conversion. The Technip PM had worked for me at a previous company. He did not honor my request to meet and review the estimate again. Charles Follmer assured me on the confidence Lyondell had on the numbers.

The Technip quantity numbers had been agreed upon with the two Lyondell estimators.  Both estimators resigned from Lyondell in early 2014. Only two people on the Lyondell team, Moulton and Follmer , understood the estimate details when I arrived at the AFW office.  They understood the estimate detail but neither had the background to challenge the numbers for this major design. The original budget was very flawed in that it did not establish realistic material quantities. It did not incorporate the risks due to design complexities, and what needed to be allotted for construction.

Throughout 2014 and through the spring of 2015, the major equipment forecasted costs were tracking fairly close due to the early procurement during the FEED phase and actual costs were able to be used for the estimate. Outside of the equipment, the materials cost was based on the quantities estimated by Technip which were not accurate. Etter, thinking that the project could still meet the early plan of the turnaround starting in November, 2015 instructed AFW in August 2014 to make a very large purchase of valves thinking they would be required for field work at site in January, 2015. Etter did not inform me of this action that had taken place, and when I found out, valves had already shipped to the site. The valve supplier thinking urgent delivery provided from his warehouse surplus at a high cost. Many of the valves were from foreign supply not on Lyondell's approved manufacturer list. I ordered a full review at site to insure documentation and certification. The valves were ordered even though hydraulics had not been done and final line and valve sizes were not known.

The construction cost in the estimate was left in place as no contractors working outside of the furnaces were onboard yet. They were to be tasked with confirming the quantities and the installation labor and indirect labor cost. Lyondell's cost continued to be based on the September 2015 shutdown date even though impacts from the late hydraulics and rework of AFW design errors were driving the project turnaround much further out than planned.

BMcD began to uncover more design errors. The late hydraulics work by AFW led to many additional lines and included changes to line diameters that had been established by Technip. Many lines already designed needed to be changed. The changes that were ongoing delayed 3D model reviews between AFW and the operations group at the site. The plant operations group also made many changes to tie in locations as the reviews took place to finalize the design. This required much rework by AFW piping design planning and field team located at the site.

The piping isometric s issue to the fabricators were being expedited by AFW and pushed very hard continuously by myself. Because the issue of piping isometrics had been delayed due to the hydraulics effort, the piping fabricator Turner Industries put the pre turnaround pipe fabrication work on hold and informed AFW. AFW Procurement Manager never informed me or any other person in Lyondell. This

VEIT00033

fact was discovered by me in late June when I communicated with the company on a unit rate change they were seeking. The repercussions were a major impact to the project and it was June, 2015.

I arranged a meeting with JVI Industries the other construction contractor. At a meeting on the Monday of week I had the medical emergency, I split the pipe fabrication scope between Turner and JVI. JVI confirmed they could make up the lost time Lyondell incurred using Turner, who had assumed AFW did inform Lyondell about the work stoppage.

From my hospital bed, I wrote an email to McFall advising him to expedite the AFW Procurement group to issue the purchase order to JVI. McFall failed to understand the criticality of this urgent requirement. It was two months later, September, 2015 before the purchase order was issued to JVI by AFW. This late action by AFW further complicated the project schedule as pipe erection in the plant for the pre turnaround scope needed to be done between September and January, 2016 in order to meet the February 2016 target. Etter's failures were being compounded by the failure of McFall to drive the required actions after my departure. McFall was still adjusting to the crossfire from many directions.

The construction of the CC Expansion Project was awarded to two companies, Turner Industries and JVI Industries. The split of work was defined by Moulton and approved by Brown and Tripp in 2013. When I joined Lyondell in August 2014, the contracts had still not been issued. The split of work was not the standard ISBL/OSBL. Thus it had plant area overlaps that were going to be difficult during the T/A. Brown's real intention was to balance the scope between the two contractors and use their assumed expertise. The problem was that it was backwards in areas outside of the scope for the furnaces. Compounding the split of work was that the financial structure of the contracts negotiated by Lyondell was different with each contractor with respect to agreed direct and indirect labor rates.

I realigned the split of work to have no overlap, in early May, 2015 and which still was balanced and much less confusing. The scopes were reviewed at site with the two construction contractors, Cain and Lyondell construction staff team. When I left the project in late June for medical leave, the revised contracts still had not been issued. I do not believe the contracts were ever issued and I was not sure how this construction execution was addressed by McFall and Cain. It would have facilitated the work in the field.

The design changes being made by AFW were leading to a complete reassessment of the construction cost which had been planned on the breakdown in the Technip FEED package that Moulton had issued to the two contractors. The staffing planning was being made very difficult for the two contractors because of design and pipe fabrication delays, hence portending much higher construction costs.

The primary issue at site that I was addressing in May and June, 2015 was to require the two constructors to issue a resource loaded construction schedule for pre T/A capital project work and then followed by end of August. T/A schedule which was integrated with the maintenance turnaround activities. This was needed not only to move the progress in the field but to be able to get a handle on the construction costs that were used for the sanctioned budget.

Tatum, Cain and Valenta were very serious detractors from cooperating and contributing to this goal. The reason for their lack of commitment was their intent to convince Lyondell Executive Management the best option for the CC Expansion Project was for them to run the project. They already had Tripp in their pocket. Tripp and McFall were bystanders. Brown too fell susceptible to the wrong direction promoted by Tatum and bears ultimate responsibility to Bob Patel and Lyondell shareholders.

18

The two constructors at site struggled to employ experienced resources and needed to balance the CC Expansion project with local competing industry projects ongoing. The Korean fabricators had delayed delivery of the equipment but it was not at all a serious factor because the piping and steel design errors and rework by AFW had delayed being able to take advantage of on time equipment delivery. Again it resulted from not having a clear basis of design being established early and selecting AFW who was not able to execute an ethylene design.

The project cost overruns were overwhelming in construction and materials increase resulting from a design that was different than what had been the basis for the sanctioned budget.  The material quantities were wrong. Moreover, not only was there the increase in engineering costs, but also Lyondell's staffing and plant operations costs were ramped up due to the project delay.

The runaway construction costs resulting from inefficient planning was an abject failure in responsible oversight by Tripp, McFall, and most of all, by Cain who had assumed charge of the capital project after I had taken medical leave. I was later told there were for a significant duration, 3400 construction hands executing the work at site, 1700 per shift. That translated to enormous costs that were not predicted.

**Section:  Response to Charge Allegations Charge: My supervisor Patrick McFall told me in more than one occasion that I needed to consider retirement.**

In the section of the Statement of Position referenced above, McFall is quoted as to have spoken to me about "angry outburst" is a false statement as there were no angry outbursts. He never spoke to me about or even implied any such concern. He did in fact as he reported,  advise me to retire and very likely was concerned about my health not only from a personal standpoint but also how my health would affect me in leading another major project.

His statements support my charges of age and disability discrimination.  The high medical payments paid out on my behalf for my condition through the Lyondell health insurance provider were significant, and perhaps a consideration to the decision. I firmly maintain that my departure from Lyondell was not due to performance or to any interpersonal conduct issues as alleged by Lyondell. My filed charges of age and disability discrimination are valid and with merit.

**Lyondell Future Projects**

The CC Expansion project's unbelievable cost overrun was likely not explained factually to Bob Patel or the shareholders Board of Directors because it was very hard for Brown to know what really happened and why the outcome was poor. Direct Holders of LYB stocks that are listed on financial sites include the two largest Direct Holders, Bob Patel and Kevin Brown.

Brown is no longer with Lyondell. Tripp, Moulton, and Cain are no longer employed by Lyondell. Tatum, McFall, and Etter may have survived. They should all have been fired for the poor outcome of the CC Ethylene Expansion project for which they were directly accountable. They impacted the company's financial bottom line. The Equistar Corpus Christi Ethylene Plant experienced operational delays in early 2017 and to this day in July, 2017 has not fully benefited from the CC Ethylene Expansion Project.

As a current shareholder since early January, 2016, and being very knowledgeable on what happened on the CC Ethylene Expansion Project and the consequential impacts that occurred because of the poor

19

VEIT00035

Executive Management oversight, I am considering contacting the Board of Directors and submit my findings and opinion as reflected herein of why the Lyondell Equistar CC Ethylene Expansion Project failed. It was not attributed in any way to my role in the project at Lyondell. I believe an analysis needs to be made of how Lyondell's Executive Management will insure proper corporate governance is assured. Lyondell certainly failed on past projects and especially on the CC Ethylene Expansion Project.

A world largest PO/TBA project is now moving forward with published forecasted cost of $2.4B. This is serious expenditure for the company. The project leadership and selection of design contractor needs to be closely evaluated. Lyondell Executive Management needs to be directly accountable. This project is the largest in Lyondell history.  I was briefly assigned to this project upon my return from medical leave and before leaving Lyondell in late January, 2016. I noted several warning flags and had alerted McFall in December, 2015 of my observations. He seemed to be aware of the issues. Lyondell Is today continually advertising for a position titled Global Projects Director and also a Project Manager position.

**Closing**

My comments included herein are made to address the false and unfounded allegations by Lyondell Chemical Company in the Statement of Position dated February 1, 2017.

I do think it would be informational and important if CEO, Bob Patel, read my comments to the Lyondell Chemical Company Statement of Position, dated February 1, 2017. The trust and faith he placed in his Executive Management, Global Projects and Plant teams was betrayed as I have discussed. Lyondell was not been betrayed by me.

 I was the best leader and asset Lyondell had that was involved with this important Corpus Christ Ethylene Expansion Project. For the most part, I enjoyed the challenge it presented.

I will continue to evaluate my legal options and seek counsel as to what is a possible course of action.

Please contact me should you have any questions or need additional information.

Sincerely,

Michael Veit

20

# REQUEST FOR FAMILY OR MEDICAL LEAVE

**Name:** _MICHAEL J. VEIT_

**Social Security No.:** _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_

**Work Location:** _CVO - AMEC FW office_

**Work Telephone:** _832-679-7933_

I request a leave for family or medical reasons which fall under one of the following categories (*Please check appropriate category*):

☐ Birth, placement, adoption of a child

☐ Care for a Qualified Family Member
with a Serious Health Condition
(Must complete Medical Certification Form if intermittent or reduced leave is requested.)

☑ For a personal Serious Health Condition
(Be sure you have completed your application for Short Term Disability benefits, which require medical certification. You must also complete a Medical Certification Form if intermittent or reduced leave is requested.)

If leave is for someone other than yourself, please indicate relationship to individual requiring care: _____

**Begin Date:** _06/26/15_      **Return to Work Date:** _____

I understand that at the end of the leave, I will be returned to my current position or one of equal pay grade, pay, seniority, status, and benefits. My right to return to my job will be in accordance with the provisions of any applicable collective bargaining agreement. If I cannot return on the designated date, I understand that I must, in advance and in writing, request an extension. Failure to report back or notify management may result in my employment status being changed to resignation. I further understand that any applicable personnel actions (e.g., layoff, scheduled salary action, etc.) will proceed upon my return. I also understand that any false answers or statements knowingly made by me on this request, or in connection with the above-mentioned request, will be sufficient ground for disciplinary action up to and including discharge.

**Employee Signature:** _Michael J. Veit_   **Date:** _07/06/15_

**Immediate Manager Signature:** _____   **Date:** _____

Case 4:18-cv-00576 Document 15-5 Filed on 08/30/19 in TXSD Page 23 of 26

## DIARY AND WORK RECORD

NAME OF PROJECT | DETAILS OF MEETINGS • AGREEMENTS • DECISIONS

1. 9AM PAD Review
2. Politics (Football) ~15 minutes (Playoffs)
3. Talking/Rpo on communication on ECO DBN
4. (I stated that it must have been related to Cowan, Tatum, and Valentaa's not to LYB
5. our to Cond. Contractor of AFWD Seamo to
6. have been a negative for me and McFall
7. stated "you need to lay low and just fly"
8. I need good grades to give Klopfenman
9. "At 9PM I was fired to finish this stuff
10. I need to prepare the phxg was originally shipped
11. here to FW. Jan 2014 Sept actual
12. I mentioned into McFall that the
13. since was no due diligence as a
14. reflection of FW by LYB and not
15. staffing with an experienced PM
16. All the cost control system
17. On June 24 interview with the
18. startup level group called ePM
19. (electronic Project Management) I
20. stated to Gohry Seyc (ePM CEO)
21. "No ONE that buys back in March
22. trying to counter the poor install
23. with Mike Cain and Randy Tosch
24. and Allen Valenotte
25. Then on June 25 (3AM) had my HHM
26. civil left project control was given
27. over to Cain Darts Rosewring staff
28. tplmt. Cain has not been effective
29. leader for the project and now as
30. you say Pat we hope Aphretz sent
31. VAPN ePM RLG HDM, RLG Traweek
32. from Canada to help Thrycoem
33. with Planning. Pat McFall stated
34. that Kraphcelli was so bad that she
35. be hired my back. I said that the
36. control of the project by GPyo was
37. adversely to his and I would take
38. Charlie Etter will go back to Engineer
39. Maybe Ross and B were too per Pat McFall
40. Pat McFall agreed to want to keep the PDTS project out...



October 1, 2013

**To:**      **All U.S. Employees**[1]

**From:**    **James L. Gallogly, Chief Executive Officer**

**Subject:**  **Reaffirmation of Support for Our Equal Employment Opportunity and Affirmative Action Plans and Programs**

I would like to take this opportunity to personally reaffirm to each one of you that it is the Company's policy to administer its employment practices without discrimination against any applicant or employee because of race, color, religion, sex, national origin, citizenship, ancestry, age, marital status, sexual orientation, disability, medical condition, genetic information, or veteran status and to ensure that all employment decisions are based only on valid job requirements. The policy applies to all job titles and all areas of employment, including recruitment, hiring, training and development, promotion, transfer, termination, layoff, compensation, benefits, social and recreational programs, and all other conditions and privileges of employment in accordance with applicable Federal, State, and local laws. Our Company is also committed to having a workplace free of harassment or any other type of intimidation. No employee, contractor, vendor, customer or visitor to our premises may discriminate or harass another person based upon his or her protected group status.

It is the Company's policy to comply with all of the relevant and applicable provisions of the Americans with Disabilities Act (ADA). The Company will not discriminate against any qualified employee or job applicant with respect to any terms, privileges, or conditions of employment because of a person's physical or mental disability. The Company also will make reasonable accommodations for physical or mental limitations of otherwise qualified applicants or employees with disabilities, provided the accommodation does not pose an undue hardship.

The Company also expects any third parties with which we do business to comply with this policy when interacting with our employees.

---

[1] This memorandum relates to all U.S.-based employer companies within the LyondellBasell global group of companies, including Houston Refinery LP, Lyondell Chemical Company, and Equistar Chemicals, LP (collectively, referred to in this memorandum for ease of reference as the "Company").



Equal employment opportunity notices are posted on appropriate employee bulletin boards as required by law.  The notices summarize the rights of employees to equal opportunity in employment. Employees and applicants for employment shall not be subjected to harassment, intimidation, threats, coercion or discrimination because they have engaged or may engage in filing a complaint, assisted in a review, investigation, or hearing, or have otherwise sought to obtain their legal rights under, or opposed any act or practice made unlawful under any Federal, State or local Equal Employment Opportunity law.

Management is responsible for seeing that the Company's equal employment opportunity policies are implemented and all employees share in the responsibility of ensuring that, by their personal actions, the policies are effective and apply uniformly to everyone.  The Sr. Vice President and Chief Human Resources Officer is designated as the Company's Equal Employment Opportunity Official and is responsible for enforcement of all equal employment opportunity and affirmative action policies.  One of the Equal Employment Opportunity Official's duties is to establish and maintain an internal audit and reporting system to allow for effective measurement of the Company's programs.

More detailed information about the Company's "Equal Employment Opportunity" and "Workplace Free of Harassment and Discrimination" policies can be found on internal postings within our facilities, or on our website.  Employees who observe any conduct that might violate these policies should immediately report such information to a supervisor, manager, or a Human Resources representative.

Please join me in this Company commitment to give our Equal Opportunity and Affirmative Action programs positive support.

James L. Gallogly
Chief Executive Officer

| Title: **RETURN TO WORK** | Procedure No. | **HSE-04-P08** |
|---|---|---|
| | Page | **1 of 1** |
| | Revision | **1** |
| | Issue Date | **4/1/07** |

## Figure 1
## Transitional Work Duty Information

Employee: Michael Veit_____Date:9/21/2015_____

_____

Supervisor: Patrick McFall_____Unit/Area/Department: _____

Employee Medical Restrictions & Duration: _____
**No lifting, pushing, pulling or carrying greater than 25lbs.**

Start Date of Transitional Work Duty Assignment:**9/21/2015**_____

Description of Transitional Duty Assignment:



Employee Signature: _____Date: _____

| | 1st Event | 2nd Event | 3rd Event | 4th Event | 5th Event | 6th Event | 7th Event |
|---|---|---|---|---|---|---|---|
| Employee Medical Re-Evaluation Date | 10/05/2015 | | | | | | |
| Review Date of Transitional Work Duty Assignment | 10/05/2015 | | | | | | |
| Expected Date to Return to Full Work Duty | 11/09/2015 | | | | | | |

## Returned to Full Work Duty on: _____11/09/2015_____