United States District Court
Southern District of Texas

**ENTERED**

February 25, 2020

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL J. VEIT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-576 |
| | § | |
| LYONDELL CHEMICAL COMPANY, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant's Motion for Summary Judgment (Doc. 15).  The court has considered the motion, the response, the reply, the summary judgment evidence, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED IN PART AND DENIED IN PART**.

## I.  Case Background

Plaintiff filed this action against his former employer, alleging age and disability discrimination in violation of the Age Discrimination in Employment Act[2] ("ADEA") and the Americans with Disabilities Act[3] ("ADA").

### A.  Factual Background

On August 26, 2014, Defendant hired Plaintiff, who was sixty-

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 20, Ord. Dated Dec. 4, 2019.

[2]     29 U.S.C. §§ 621-634.

[3]     See 42 U.S.C. §§ 12101-12213.

five years old at the time, as an associate director in the Global Projects Group.[4]   Patrick McFall ("McFall"), director of Project Management Services for the Global Projects Group, had known Plaintiff personally and professionally for thirty years, and Defendant hired Plaintiff based in part on McFall's recommendation.[5]

Defendant assigned Plaintiff to an expansion project at an ethylene complex in Corpus Christi ("CC Project"), which was behind schedule when Plaintiff began working for Defendant.[6]   Plaintiff later testified that, early in his tenure, he "became aware of many serious problems in the execution of the project[.]"[7]   Plaintiff "continually discussed . . . the potential impacts" with McFall and Stanley Tripp ("Tripp"), director of Global Projects.[8]

According to Angela Silvagnoli ("Silvagnoli"), a human resources consultant, "Shortly after [Plaintiff] joined the Global Projects Group, [Defendant] received complaints regarding [Plaintiff's] lack of leadership and behavior on the [CC]

---

[4]   See Doc. 15-1, Ex. A to Def.'s Mot. for Summ. J., Angela Silvagnoli's ("Silvagnoli") Decl. p. 2; Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 1.

[5]   See Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 2.

[6]   See id.; Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 1.

[7]   Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 1.

[8]   Id. p. 3 (unnumbered); Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. pp. 1, 2.

Project."[9]   Silvagnoli indicated that these complaints regarding Plaintiff's "behavior and lack of leadership" prompted an investigation.[10]   Tripp said that, "[a]s early as December 2014, . . . [he] became aware of concerns regarding [Plaintiff's] behavior and lack of leadership" on the CC Project.[11]   Yet, Plaintiff received a successful performance rating on his December 2014 appraisal.[12]

On June 19, 2015, one of Plaintiff's colleagues reported to McFall and Tripp that Plaintiff had "crossed a line when he publicly accused [the colleague] of lying[,]" and, when the colleague protested, Plaintiff "went into a loud, angry, abusive outburst about [the colleague's] performance."[13]   Because other individuals also voiced similar issues with Plaintiff, Defendant held a team-building session "to enhance the quality of the communications between [Plaintiff] and his colleagues."[14]   According to Tripp, Plaintiff did not take the session seriously.[15]

---

[9]     Doc. 15-1, Ex. A to Def.'s Mot. for Summ. J., Silvagnoli's Decl. p. 2.

[10]    Id.

[11]    Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 2.

[12]    See Doc. 17-4, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Termination Summ. p. 2.

[13]    See Doc. 15-3, Ex. B-1 to Def.'s Mot. for Summ. J., Email from Charles Etter to McFall & Tripp Dated June 19, 2015.

[14]    Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 3.

[15]    See id.

In late June 2015, ten months after Plaintiff began working for Defendant, Plaintiff suffered a massive heart attack while attending meetings at the CC Project site.[16] Although Plaintiff was not eligible for medical leave pursuant to the Family Medical Leave Act due to his short tenure, Defendant provided Plaintiff twelve weeks of paid leave.[17] Plaintiff underwent surgery for the placement of a stent in his right coronary artery.[18] In August 2015, after Plaintiff had healed from that surgery, he underwent a second surgery to repair an aneurysm in his left ventricle.[19] McFall temporarily assumed Plaintiff's role with the CC Project and reported to Tripp that it had significant issues causing increased costs and delays.[20]

During the home recovery period, Plaintiff communicated about the CC Project with McFall and other team members.[21] In early August 2015, McFall "identified several projects requiring [Plaintiff's] leadership and experience that were in various

---

[16] See Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 1.

[17] See Doc. 15-1, Ex. A to Def.'s Mot. for Summ. J., Silvagnoli's Decl. p. 2.

[18] See Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 1.

[19] See id.

[20] See id.

[21] See Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 2.

4

planning stages."[22]  Yet, more than once, McFall asked Plaintiff why he was not considering retirement.[23]  Plaintiff explained that he intended to work for at least five more years.[24]

McFall told Plaintiff that he "would be stationed at the engineering contractor's office upon [his] return in September 2015 in order to complete the design phase and [would] not be required to go back to the [CC Project] site."[25]  McFall further stated that the placement "would be less stressful" and the CC Project was nearing the end of the design phase.[26]  Over time, McFall mentioned four or five projects Defendant was considering for Plaintiff's placement.[27]

When Plaintiff returned on September 21, 2015, he returned to the same level position with regard to pay and title.[28]  His doctor-imposed physical restrictions were not implicated by his duties in

---

[22]   Id. p. 3 (unnumbered).

[23]   See id.

[24]   See id.

[25]   Id. p. 2 (unnumbered); see also Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 79-80.

[26]   Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 2.

[27]   Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. p. 80.

[28]   See Doc. 15-1, Ex. A to Def.'s Mot. for Summ. J., Silvagnoli's Decl. p. 2; Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 77-78.

that level position.[29]  Plaintiff did not return to the CC Project in any capacity but, instead, was assigned to "a very minor role" on another project.[30]  Plaintiff explained, after the fact, that he felt "shunted . . . to really nothing to do."[31]  Plaintiff explained that his "only assignment was [to] interface with the licensor," which occurred "maybe once a week" and to contribute to the selection of the engineering contractor.[32]  McFall told Plaintiff that Plaintiff needed "a much lower-stress job" and that the new position would last five years.[33]

Beginning in November 2015 and concluding in January 2016, Defendant conducted a "cost-re-estimate" for the CC Project that revealed cost overruns of approximately $270 million.[34]  The overruns were attributed to poor project management, much of which occurred during Plaintiff's tenure on the CC Project.[35]

In a report dated January 25, 2016, Silvagnoli recorded the results of an investigation into negative feedback about

---

[29]   See Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 75-76.

[30]   Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. pp. 2-3 (unnumbered).

[31]   Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. p. 78.

[32]   Id. pp. 77, 78.

[33]   Id. p. 79.

[34]   Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 4.

[35]   See id.

Plaintiff's performance prior to his heart attack.[36]  According to the report, Silvagnoli procured documents regarding the CC Project from the time when Plaintiff was the manager, which included a summary of the CC Project team's concerns as of February 2015.[37]

Silvagnoli also interviewed five individuals associated with the CC Project and one individual associated with the new project to which Plaintiff had been assigned upon his return.[38]  Among the words and phrases used to describe Plaintiff's interaction with others on the CC Project were "bullying people," "hard to work with," "destructive impact," "abrasive to work with, blunt," "threw me under the bus," and "jumped on Global Projects employees instead of holding the contractor accountable."[39]  The employee who was interviewed about the new assignment said that he "ha[d] concerns that [Plaintiff] ha[d] not done any work since joining the new project."[40]

Silvagnoli concluded that Plaintiff "demonstrated performance issues in relationship building/interpersonal capability, teamwork, and managing the engineering work on the contract."[41]  She

---

[36]    See Doc. 17-3, Ex. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep., Investigation Report.

[37]    See id. p. 1.

[38]    See id. pp. 1-2.

[39]    Id. (internal quotation marks omitted).

[40]    Id. p. 2 (internal quotation marks omitted).

[41]    Id.

continued:

> He was viewed as difficult to work with and created
> resistance from the contractor to work collaboratively
> with the project team.   Further, it was confirmed by
> multiple witnesses that [Plaintiff] instructed Global
> Projects employees to withhold information from the
> Corpus Christi site project managers.   According to
> numerous accounts, [Plaintiff's] failure to establish .
> . . a strong team environment negatively impacted the
> project's progress.[42]

At no time while in Defendant's employ prior to the termination meeting did Plaintiff receive any write-up, counseling, or corrective measure indicating that his performance was in question.[43] McFall evaluated Plaintiff's performance for the period January 1, 2015, through December 31, 2015.[44]   The written performance appraisal stated that Plaintiff was "strong technically" and was a "very focused" project manager.[45]   The appraisal narrative continued, in its entirety:

> He was installed in a difficult situation with a
> contractor exhibiting poor performance and was provided
> a weak . . . sup[p]ort team[.]  He was able to improve
> the situation markedly.   However, for future
> assignments[,] it is expected that [Plaintiff's] strong
> results-driven management style will be tempered to
> deliver projects from a position of leadersh[i]p,
> mentoring and effective communications.
>
> . . . .

---

[42]   _Id._

[43]   _See_ Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 4.

[44]   _See id._

[45]   _See_ Doc. 17-5, Ex. 5 to Pl.'s Resp. to Def.'s Mot. for Summ. J., 2015 Performance Appraisal Doc. p. 3.

> [Plaintiff] helped move the project forward after taking
> over in Q3 2014 through strong determination, setting
> very high expectations and personal effort.  It is
> suggested that [his] management style be tempered in
> future assignments to provide for higher level of
> relationships and teamwork.
>
> . . . .
>
> [Plaintiff's] effectiveness was negatively impacted by
> his personal style.  I expect to see much better
> collaboration and cooperation with the manufacturing
> personnel[,] and this must improve in the future.  I
> appreciate the hard work, let's work on results.[46]

After consulting with his manager, Tripp "decided to terminate [Plaintiff's] employment because of his poor performance."[47]   On January 26, 2016, in a meeting that included Silvagnoli, Tripp informed Plaintiff that he was being terminated.[48]   Tripp said to Plaintiff, "[Y]ou didn't right the ship."[49]   To which Plaintiff replied, "[T]he ship was sunk before I arrived . . . .  I was your best asset[,] but you need a scapegoat."[50]   At the meeting, according to Plaintiff, Trip did not address Plaintiff's leadership or performance and did not mention any problem with Plaintiff's communication.[51]

---

[46]     Id.

[47]     Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 4.

[48]     See Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 3 (unnumbered).

[49]     Id.

[50]     Id.

[51]     See Doc. 17-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Decl. p. 3 (unnumbered).
According to Silvagnoli, Tripp "indicated that [Plaintiff's] termination

A termination summary dated January 22, 2016, noted no previous warnings.[52]   As rationale for termination, the summary stated, in part:

> Despite ongoing feedback regarding the project's poor progress, [Plaintiff] failed to establish a cohesive team, manage the contractor(s), or improve project performance. . . . [I]t has become apparent that his lack of interpersonal capability far overshadowed any perceived short-term productivity gains and ultimately proved detrimental to the project's long-term success. . . . [H]e was witnessed berating his team members publicly on multiple occasions during joint meetings with the contractor.  He also instructed members of the Global Projects . . . group not to share information with the . . . site project/turnaround leaders.
>
> Rather than managing cost . . . as expected, [Plaintiff] focused his attention solely on the technical aspects of the job. . . .
>
> Because of [Plaintiff's] unwillingness to collaborate and lead the team toward a common goal, the project faces significant overruns, and the turnaround start date has been postponed twice. [Plaintiff's] ineffectiveness as a leader and failure to improve the [CC Project] has prompted management to recommend immediate termination of employment.[53]

Another section of the form asked for a description of performance issues and corrective measures taken.[54]  The descriptive

---

was the result of his poor performance, including his lack of leadership and behavior" while working as associate director on the CC Project.  Doc. 15-1, Ex. A to Def.'s Mot. for Summ. J., Silvagnoli's Decl. p. 2.  According to Tripp, he informed Plaintiff that his termination was due to poor performance on the CC Project, "which included the cost overruns, his lack of leadership, and his abrasive management practices."  Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 4.

[52]   See Doc. 17-4, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Termination Summ. p. 1.

[53]   Id. pp. 1-2.

[54]   See id. p. 2.

timeline began with Plaintiff's start day, and the next two entries dated November 17, 2014, and December 10, 2014, included negative information similar to that reported to Silvagnoli during her investigation but identified no corrective measures taken or counseling provided at the time.[55]  Additionally, the December 10, 2014 entry stated that Plaintiff "received a 1.0/successful performance rating due to his limited time with the Company and reported progress with contractor."[56]

The next entry covered the period when Plaintiff was out on approved medical leave and stated "When [Plaintiff's] Director, . . . McFall[,] stepped into the [CC] Project Director role, details of [Plaintiff's] ineffectual performance in the role came to light."[57]  The last entry described Plaintiff's December 2015 performance appraisal as "point[ing] out the flaws in his leadership style (lack of collaboration/cooperation) and failure to manage, which contributed to the project's poor performance."[58] Defendant terminated two other employees, ages fifty-four and forty-five, at the same time as Plaintiff, also due to performance issues related to overruns on the CC Project.[59]

---

[55]    See id.

[56]    Id.

[57]    Id.

[58]    Id. p. 3.

[59]    See Doc. 15-1, Ex. A to Def.'s Mot. for Summ. J., Silvagnoli's Decl. p. 2.

11

**B.**   <u>**Procedural Background**</u>

On February 25, 2018, Plaintiff filed the present action.[60] Based on the allegations of age and disability discrimination, Plaintiff sought injunctive relief against Defendant to prevent it "from continuing to abridge the rights" of Plaintiff and to reinstate Plaintiff to his former position with retroactive "lost compensation, benefits, increments, and seniority[.]"[61]   Plaintiff also sought monetary damages for pain and suffering, punitive damages, prejudgment interest, and attorney's fees.[62]

On March 30, 2018, Defendant answered the complaint.[63]   The case was reassigned in July 2018.[64]   On August 30, 2019, Defendant filed the pending motion for summary judgment.[65]   Before the completion of the briefing on the motion, the case was reassigned a second time.[66]

On September 19, 2019, Plaintiff filed a response, and, on September 27, 2019, Defendant filed a reply.[67]   The case was then

---

[60]    <u>See</u> Doc. 1, Pl.'s Orig. Compl.

[61]    <u>Id.</u> p. 7.

[62]    <u>See</u> <u>id.</u>

[63]    <u>See</u> Doc. 7, Def.'s Orig. Ans.

[64]    <u>See</u> Doc. 13, Not. of Reassignment Dated July 13, 2018.

[65]    <u>See</u> Doc. 15, Def.'s Mot. for Summ. J.

[66]    <u>See</u> Doc. 16, Not. of Reassignment Dated Sept. 4, 2019.

[67]    <u>See</u> Doc. 17, Pl.'s Resp. to Def.'s Mot. for Summ. J.; Doc. 18, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J.

reassigned a third time and referred to the undersigned.[68]
Defendant's motion is fully briefed and ready for the court's
consideration.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that
no genuine dispute exists regarding any material fact and the
moving party is entitled to judgment as a matter of law.  See Fed.
R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986); Nall v. BNSF Ry. Co., 917 F.3d 335, 340 (5th Cir. 2019).
A material fact is a fact that is identified by applicable
substantive law as critical to the outcome of the suit.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet
Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th
Cir. 2001).  To be genuine, the dispute regarding a material fact
must be supported by evidence such that a reasonable jury could
resolve the issue in favor of either party.  See Royal v. CCC & R
Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting
Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary
judgment motion and must point to relevant excerpts from pleadings,
depositions, answers to interrogatories, admissions, or affidavits
that demonstrate the absence of genuine factual issues.  See

---

[68]   See Doc. 19, Not. of Reassignment Dated Oct. 23, 2019; Doc. 20, Ord.
Dated Dec. 4, 2019.

Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A., 759 F.3d 498, 505 (5th Cir. 2014)(quoting Celotex Corp., 477 U.S. at 323). The movant may meet this burden by making the allegation that the nonmovant has failed to produce evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof.  See Celotex Corp., 477 U.S. at 322; Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017).

If the movant carries its burden, the burden shifts to the nonmovant who may not rest on the allegations or denials in the pleading but must respond with evidence showing a genuine factual dispute.  See Coastal Agric. Supply, Inc., 759 F.3d at 505 (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)). The court must accept all of the nonmovant's uncontroverted evidence as true and draw all justifiable inferences in his favor. Id. (quoting Anderson, 477 U.S. at 255).  However, conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden.  Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  The court should "avoid credibility determinations and weighing of the evidence." Nall, 917 F.3d 340.

### III. Analysis

Defendant seeks summary judgment on both of Plaintiff's discrimination claims.  Before addressing the merits of Defendant's motion, the court needs to consider complaints each party lodge

against the other's evidence.  Plaintiff questions the provenance of the June 19, 2015 email complaining of Plaintiff's behavior "as the email appears to be a forward, blacking out who was subsequently sent to or created by prior to becoming Defendant's exhibit."[69]  To the extent Plaintiff intended this observation to be an objection, it is **OVERRULED**.  Tripp authenticated the email in his declaration.[70]  Thus, the court finds it sufficiently reliable.

Defendant challenges portions of Plaintiff's declaration, arguing that Plaintiff "attempts to supplement his prior deposition testimony" with "anecdotal claims" suggesting that Defendant had a "pattern of discriminating against older workers."[71]  Defendant asks the court to strike those portions.  The court **DENIES** Defendant's request, finding that any difference between Plaintiff's deposition and declaration does not rise to the level of a sham affidavit wherein he manufactured a fact issue by impeaching his prior testimony.  See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000).

## A.    Employment Discrimination Law

To prove employment discrimination based on age or disability, a plaintiff may rely on direct or circumstantial evidence or both.

---

[69]    Doc. 17, Pl.'s Resp. to Def.'s Mot. for Summ. J. p. 14; see also Doc.15-3, Ex. B-1 to Def.'s Mot. for Summ. J., Email from Charles Etter to McFall & Tripp Dated June 19, 2015.

[70]    Doc. 15-2, Ex. B to Def.'s Mot. for Summ. J., Tripp's Decl. p. 2.

[71]    Doc. 18, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. p. 8.

See Nall, 917 F.3d at 340 (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 896 (5th Cir. 2002)).  "Direct evidence of discrimination proves the existence of a fact without any inferences or presumptions" and usually "takes the form of a discriminatory statement directly connected to the plaintiff's discharge."[72]  McMichael v. Transocean Offshore Deepwater Drilling, Inc., 934 F.3d 447, 455 (5th Cir. 2019)(omitting internal alteration marks)(quoting Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 958 (5th Cir. 1993), & citing Moss v. BMC Software, Inc., 610 F.3d 917, 929 (5th Cir. 2010)).

If, however, the plaintiff relies on circumstantial evidence, he must meet the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Nall, 917 F.3d at 340.  Under that framework, the plaintiff bears the first burden of producing evidence of a prima facie case of discrimination.  See id. at 341.  If he is successful, the burden shifts to the employer

---

[72]    Plaintiff asserts that he can establish a discrimination claim by either direct or circumstantial evidence but subsequently appears to acquiesce that he cannot produce direct evidence of discrimination.  The court agrees with his acquiescence.  For comments to rise to the level of direct evidence of age or disability discrimination, they must be: (1) related to age or disability; (2) proximate in time to the adverse employment action; (3) made by the person making the employment decision; and (4) related to the adverse employment action.  See Clark v. Champion Nat'l Sec., Inc., 947 F.3d 275, 285 (5th Cir. 2020).  The comments Plaintiff cites as evidence of discrimination are McCoy's inquiries about retirement and his suggestion that a lower stress position would benefit Plaintiff.  These comments can be understood as related to age and/or disability and were made within a month of Plaintiff's return placement although about four months before his termination.  While McCoy was the speaker of the comments, Tripp, according to his testimony, made the placement and the termination decisions.  The comments were not directly related to either decision and do not rise to the level of direct evidence.  See, e.g., id. at 284 (describing circumstances that the Fifth Circuit has found to amount to direct evidence of discrimination).  As discussed below, the court considers the comments as evidence of pretext.

"to articulate a legitimate, non-discriminatory reason for the adverse employment action." Id.  If the employer satisfies its burden, the plaintiff must produce sufficient evidence that the employer's "articulated reason is pretextual." Id. at 342 (quoting Cannon v. Jacobs Field Servs. N. Am., Inc., 813 F.3d 586, 590 (5th Cir. 2016)).

**B.  ADEA**

The ADEA prohibits employers from discharging any individual "because of such individual's age[.]"  29 U.S.C. § 623(a)(1).  A prima facie showing of age discrimination requires evidence that: (1) the plaintiff was in the protected class of individuals at least forty years old; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of his age. See 29 U.S.C. § 631(a) (setting age limit); Goudeau v. Nat'l Oilwell Varco, 793 F.3d 470, 474 (5th Cir. 2015)(presenting elements in a different order).

"[T]he plaintiff must show that his age was the 'but-for' cause of his termination—proving that age was a 'motivating factor' for the decision is not enough."  McMichael, 934 F.3d at 455 (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180 (2009)). In other words, the plaintiff "must prove by a preponderance of the evidence that the legitimate reason[] offered by the defendant

w[as] not its true reason[], but w[as] a pretext for discrimination." Goudeau, 793 F.3d at 474.

Plaintiff categorizes the assignment after medical leave as a demotion, but the court is unsure whether that is merely hyperbolic argument. To be clear, a transfer to another position with the same pay and title "can be a demotion if the new position proves objectively worse–such as being less prestigious or less interesting or providing less room for advancement." Alvarado v. Tex. Rangers, 492 F.3d 605, 612 (5th Cir. 2007). Here, Plaintiff returned to work after medical leave at the same level position with regard to pay and title. However, he testified that, in the new assignment, he played a very minor role in which his only duties were to interface weekly with the licensor and to contribute to the selection of an engineering contractor for the project. The court finds this sufficient evidence of demotion to survive summary judgment. Defendant does not dispute that Plaintiff's termination was an adverse employment action.

Defendant does, however, challenge the fourth element of the prima facie case. Regarding the alleged demotion, the parties agree that McCoy replaced Plaintiff on the CC Project when Plaintiff went on medical leave. The evidence suggests that McCoy remained in that position after Plaintiff's return. Defendant concedes that McCoy was eight years younger than Plaintiff. As the elements of the prima facie case reflect, Plaintiff need not

produce evidence that his replacement was younger than forty, only that the replacement be "sufficiently younger in the context of his employment to permit an inference of age discrimination." Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1506 (5th Cir. 1988).  The evidence that McFall replaced Plaintiff satisfies the fourth element of the prima facie showing on demotion.

Regarding the termination, Plaintiff testified that he was replaced by one of the project engineers who was in his forties.[73] He was unable to recall his name but knew the man from having worked with him on that project.[74]  Defendant did not argue, much less produce evidence, that Plaintiff was incorrect as to the age of his replacement.  The court accepts, as it must, Plaintiff's uncontroverted evidence as true.  Plaintiff, therefore, satisfies the fourth element of the prima facie case on termination.[75] Plaintiff has met the fourth element with the evidence that he was replaced by someone younger.

As the legitimate nondiscriminatory reason for Plaintiff's post-leave placement in a new project, Defendant asserts that the design phase was within four weeks of completion and switching back to Plaintiff would be disruptive.  As the legitimate

---

[73]   See Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 114-15.

[74]   See id.

[75]   Because Plaintiff satisfies the fourth element of the prima facie case through evidence of having been replaced by someone younger as to both adverse employment actions, the court does not address the alternative method of proof that he was otherwise discharged because of his age.

nondiscriminatory reason for Plaintiff's termination, Defendant points to poor performance.

The burden thus shifts back to Plaintiff to produce sufficient evidence that Defendant's articulated reasons for the employment actions were, in fact, untrue and only a pretext for discrimination. See Goudeau, 793 F.3d at 474. Sufficient evidence that Defendant's reasons were false combined with the prima facie case satisfies Plaintiff's summary judgment burden. See id. at 476, 478.

Plaintiff challenges the veracity of both of Defendant's reasons. On the demotion claim, Plaintiff testified that, although Defendant told Plaintiff that the engineering effort on the CC Project was expected to last for only four weeks past Plaintiff's return, that phase was not actually completed in four weeks but took approximately eight months.[76] Plaintiff further stated, "There was an awful lot of engineering to do."[77]  This is sufficient evidence to survive a summary judgment motion.

On the termination claim, Plaintiff raises questions about Defendant's timeline and account of events leading to Plaintiff's termination.  For example, Tripp averred that he became aware of concerns regarding Plaintiff's behavior as early as December 2014 and that one of Plaintiff's colleagues reported an incident with

---

[76]    See Doc. 17-2, Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 80-81.

[77]    See id. p. 81.

Plaintiff to McFall and Tripp in June 2015. However, Tripp recorded in the termination summary that Plaintiff's poor performance came to light when McFall took over Plaintiff's role after his heart attack in late June 2015.

Not only are these assertions inconsistent, but they raise other issues. Tripp knew of the problems as early as December 2014 but did not take any corrective measures or counsel Plaintiff. Moreover, Plaintiff received a successful performance rating for 2014. Tripp claimed in his declaration that he held a team-building session in response to the June 2015 complaint (along with similar complaints by other individuals for which Tripp provided no detail or documentation). Tripp testified that Plaintiff did not take the session seriously. Be that as it may, Tripp did not reprimand Plaintiff or mention the team-building session in the termination summary, much less note that it was directed toward Plaintiff's poor performance or that Plaintiff failed to take it seriously.

Silvagnoli testified that she knew about complaints regarding Plaintiff shortly after Plaintiff began working for Defendant. She said that those complaints prompted an investigation. Yet, the only paperwork she cited was her investigation report that was dated January 25, 2016, more than a year after she claimed to have heard about the complaints, three days after the termination summary was completed, and one day before Defendant terminated

Plaintiff.  Neither the complaints Silvagnoli allegedly heard nor the start of the investigation was logged on Plaintiff's termination summary.

The termination summary described Paintiff's 2015 performance appraisal as much more negative than reflected in McFall's documentation.  The termination summary referred to "ongoing feedback regarding the project's poor progress," but no testimonial or documentary evidence corroborates that any feedback was given to Plaintiff.[78]  Additionally, the entries in the termination summary dated in November and December 2014 are very similar to the information in Silvagnoli's investigation report.  In fact, one of the entries refers to "one GP employees interviewed," and the only evidence of employees being interviewed was in Silvagnoli's investigation report.[79]

The evidence gives rise to a plausible inference that Defendant manufactured a history of poor performance and, more importantly, raises a fact question regarding Defendant's articulated reason for termination.  Other evidence also supports an inference of discrimination.  One piece of such evidence shows that at least two other employees over the age of fifty were terminated contemporaneously with Plaintiff.  That fact does not significantly bolster Plaintiff's case but does present another

---

[78]     Doc. 17-4, Ex. 4 to Pl.'s Resp. to Def.'s Mot. for Summ. J., Termination Summ. p. 1.

[79]     Id. p. 2.

consideration.

Additionally, McFall's repeated comments to Plaintiff about retirement should also be considered.  In a circumstantial case, remarks are evaluated under a more flexible standard than when asserted as direct evidence of discrimination.  See Goudeau, 793 F.3d at 475.  The plaintiff need only show that the remarks involve: "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." McMichael, 934 F.3d at 457-58 (quoting Squyres v. Heico Cos., L.L.C., 782 F.3d 224, 236 (5th Cir. 2015)).

Under the circumstances of this case, suggestions that Plaintiff consider retirement imply age bias.  Defendant emphasizes that Tripp and his superior made the decisions related to the challenged employment actions and argues that McFall's conversations with Plaintiff about retirement were entirely personal.  However, the evidence shows that McFall was Plaintiff's director and evaluated Plaintiff's performance.  As such, he was in a position to influence the decision-making process.  Despite Defendant's characterization of McFall's conversations with Plaintiff as personal, the court finds that the line between personal and professional is blurred when the discussion is between an employee and his superior and the topic is so clearly employment related.  These remarks support pretext.

The court is not tasked with determining whether Plaintiff can prove his case at trial but only with deciding whether the evidence is sufficient to allow a reasonable jury to conclude that the employer discriminated against Plaintiff because of his age.  The court finds that to be the case here.

As Plaintiff raises genuine issues of material fact on both the prima facie case and pretext, Defendant is not entitled to summary judgment on Plaintiff's claim for age discrimination.

**B.  <u>ADA</u>**

The ADA prohibits employers from discriminating "on the basis of disability in regard to . . . [the] discharge of employees."  42 U.S.C. § 12112(a).   A prima facie showing of disability discrimination requires evidence that: (1) the plaintiff had a disability; (2) he was qualified for his job; and (3) he suffered an adverse employment action on account of his disability.  <u>See</u> <u>Clark v. Champion Nat'l Sec., Inc.</u>, 947 F.3d 275, 286 (5ᵗʰ Cir. 2020).

Defendant argues that Plaintiff cannot meet the first element of the prima facie case.  Plaintiff's takes the position that he was regarded as having a disability.

A plaintiff is "regarded as" having a disability under ADA if []he:

(1) has an impairment which is not substantially limiting but which the employer perceives as substantially limiting; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but

24

is regarded by the employer as having a substantially
limiting impairment.

Bleak v. Providence Health Ctr., 454 F. App'x 366, 368 (5th Cir.
2011)(internal alteration marks omitted)(unpublished).  All three
of these categories require proof that Defendant regarded Plaintiff
as having a "substantially limiting" impairment.  See id.

For the "regarded as" analysis, an employer perceives an
employee as substantially limited in his ability to work if he is
"regarded as significantly restricted in the ability to perform
either a class of jobs or a broad range of jobs in various classes
as compared to the average person having comparable training skills
and abilities."[80]  Arthur v. BNSF Ry. Co., 697 F. App'x 826, 830 (5th
Cir. 2017)(unpublished)(quoting Kemp v. Holder, 610 F.3d 231, 238
(5th Cir. 2010))(internal quotation marks omitted).  "A class of
jobs includes jobs utilizing similar training, knowledge, skills or
abilities, within that geographical area."  Id. (quoting Bridges v.
City of Bossier, 92 F.3d 329, 334 (5th Cir. 1996))(internal
quotation marks omitted).  If an employer views an employee as

---

[80]     For this "regarded as" standard, the Arthur case relied on two cases
issued prior to the 2012 amendment to the regulatory definition of "substantially
limits."  See 29 C.F.R. § 1630.2(j); Arthur, 697 F. App'x at 830.  The revised
definition of "substantially limits" was intended to be broader in favor of
coverage for determining whether an individual is disabled.  See 29 C.F.R. §
1630.2(j); Arthur, 697 F. App'x at 830.  As Arthur cites to the revised version
of the regulatory definition in the same discussion, the court concludes that the
Fifth Circuit determined that any changes to the meaning of "substantially
limits" for purposes of determining disability did not affect the court's
"regarded as" analysis.  See Arthur, 697 F. App'x at 830; cf. Jackson v. Oil-Dri
Corp. of Am., NO. 3:16-CV-189-DMB-RP, 2018 WL 1996474, at *7 (N.D. Miss. Apr. 27,
2018)(concluding that the Fifth Circuit has continued to apply the "class of
jobs" inquiry for the "regarded as" analysis).

capable of working other jobs utilizing his skills, he is not regarded as substantially limited in the major life activity of working.[81]   <u>See</u> <u>Bleak</u>, 454 F. App'x at 369.

In this case, Plaintiff acknowledged that the duties of his former assignment and his new assignment were performed at the same level of exertion, which did not implicate the physical restrictions imposed after his heart attack.   Plaintiff offered speculation and unattributed hearsay as to Defendant's concern for Plaintiff's health, but, as neither is admissible summary judgment evidence, they do not advance the ball on Plaintiff's summary judgment burden.   Plaintiff's complaints that Defendant assigned him a minor role in the new project and that McFall suggested a lower level of stress fail to demonstrate that Defendant regarded him as significantly restricted in his ability to perform a class of jobs or a broad range of jobs.

As Plaintiff fails to meet his prima facie burden, Defendant is entitled to summary judgment on Plaintiff's claim for disability discrimination.

## IV.   Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART.**

---

[81]     In <u>Bleak</u>, which also pre-dated the 2012 amendment to the regulatory definition of "substantially limits," the Fifth Circuit was addressing whether an employee was disabled.  Because the Fifth Circuit still employs the stricter standard for "regarded as" analysis post-amendment, the court finds that the cited material from <u>Bleak</u> is still relevant for determining whether the employer regarded him as disabled.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 25th day of February, 2020.

Nancy K. Johnson
United States Magistrate Judge